# EXHIBIT 8

TENANT ESTOPPEL

To:      Jersam Realty, Inc. and its assignee, PJML Boulevard LLC

Re:      "Lease Agreement" dated April 8, 2019 together with the assignment of Lease Agreement dated September 24, 2019, between Chalpin Realty SC LLC, as landlord (hereinafter, the "Landlord") and Epic Arcades SC LLC, as tenant (hereinafter, together, the "Tenant"), with respect to the demised premises described in the Lease (hereinafter, the "Premises") and which are a part of the property bearing Horry County TMS No. 181-07-32-003 (hereinafter, the "Property").

Ladies and Gentlemen:

This tenant estoppel certificate and agreement (hereinafter, this "Agreement") is furnished by Tenant to Purchaser. Tenant understands that Purchaser is relying upon Tenant's statements and agreements.

The Tenant hereby represents and certifies to, and agrees with, Purchaser as set forth below.

1.      Other than as set forth in the Confirmed Amended Plan of Reorganization in the case styled *In re Epic Arcades SC, LLC,* No. 21-01080, in the United States Bankruptcy Court for the District of South Carolina (the "Confirmed Plan"), the Lease has not been assigned, amended or modified in any way, nor have the Premises been sublet in whole or in part.

2.      A true and complete copy of the Lease and the Confirmed Plan, including, if any, all amendments and modifications, is attached hereto as ***Exhibit A***. There are no side letters or other arrangements relating to the Premises or the Property.

3.      Subject to the Confirmed Plan, the Lease is presently in full force and effect according to its terms and is the valid and binding obligation of Tenant.

4.      As of May 31, 2022, neither Tenant nor Landlord is in default under the Lease nor does any state of facts exist which with the passage of time or the giving of notice, or both, could constitute a default under the Lease. Tenant is not aware of any circumstances which would give rise to a right on behalf of Tenant to terminate the Lease.

5.      All conditions under the Lease to be satisfied by Landlord as of the date hereof (including, without limitation, all work, if any, to be performed by Landlord in the Premises or the Property) have been satisfied, and all contributions, if any, required to be paid by Landlord under the Lease to date for improvements to the Premises have been paid.

6.      Tenant is in possession of the Premises and is fully obligated to pay and is paying the rent and other charges due under the Confirmed Plan and, subject to the Confirmed Plan, will be fully obligated to perform and is performing all of the other obligations of Tenant under the Lease.

7.      The Lease does not provide for any payments (including, without limitation, rent credits) by Landlord to Tenant which are presently due and payable, or which are due and payable in the future.

8.      On this date, to the best of Tenant's knowledge, there are no existing defenses or off-sets which Tenant has against the enforcement of the Lease by Landlord.

9.    Prior to June 1, 2022, the total of all monthly rent due under the Lease (including monthly base rent and any additional rent owed under the terms of the Lease) is the flat amount of $30,000.00, pursuant to the Confirmed Plan. As of June 1, 2022, pursuant to the Confirmed Plan, the base monthly rent under the Lease is in the amount of $30,345.00 per month set forth in the Lease and the monthly additional rent will resume under the Lease in the amount of $13,318.63 per month. For the avoidance of doubt, for the calendar year of 2022, Tenant will owe those items of additional rent under the Lease only for the pro-rated period of June through December. Further for the avoidance of doubt and pursuant to the Confirmed Plan, Tenant still owes Chalpin Realty SC LLC the sum of $138,963.14 to be paid in equal monthly installments (on May 20, 2022, June 20, 2022, July 20, 2022, and August 20, 2022) directly to Chalpin Realty SC LLC until paid in full. Tenant made its annual contribution to the Marketing Fund for the year 2022 in the amount of $0.00. No rent has been paid more than one (1) month in advance of the due date. Landlord is holding a security deposit in the amount of $0.00.

10.    Tenant has no options to extend the Lease other than that provided for in the Lease, nor does Tenant have the option to lease additional space at the Property, or to purchase the Property, and Tenant has no right of refusal with respect to leasing additional space or with respect to purchasing the Property.

11.    There are no actions, whether voluntary or otherwise, pending or threatened against Tenant, or any guarantor of Tenant's obligations under the Lease, pursuant to the bankruptcy or insolvency laws of the United States or any similar state laws.

12.    This Agreement shall inure to the benefit of Purchaser, each of its successors and assigns (including, without limitation, a purchaser at or after foreclosure), and shall be binding upon Tenant and Tenant's successors and permitted assigns.

NOTE: Nothing stated herein waives Tenant's claims for the alleged damage and losses occurring from the ceiling leaks, and the representations above are given with this exception.



DATED:  as of May 18, 2022 and executed as an instrument under seal.

                                          TENANT:


                                          Epic Arcades SC LLC, a Delaware limited
                                          liability company


                                          By: _____

                                          Name: FRANK PRACUKOWSKI

                                          Its: MEMBER

                                          Hereunto Duly Authorized

**EXHIBIT A**
**(Remainder of Page Left Intentionally Blank)**

# COMMERCIAL LEASE

Name of Shopping Center:    THEBlvd

Location of Shopping Center:    1410 NORTH OCEAN BOULEVARD
MYRTLE BEACH, SOUTH CAROLINA

Landlord:    CPC OCEANFRONT DELAWARE, LLC, a Delaware limited liability company

Tenant:    EPIC ARCADES SC LLC, a Delaware limited liability company

d/b/a:    _____

## TABLE OF CONTENTS

ARTICLE 1 .................................................................................................................. 2
Premises ................................................................................................................. 2
    1.01 - Premises .................................................................................................. 2
    1.02 - Shopping Center ...................................................................................... 2
    1.03 - Use of Premises and Trade Name ........................................................... 2
    1.04 - Existing Exclusives and Tenant's Exclusive Use .................................... 2
ARTICLE 2 .................................................................................................................. 3
Term of Lease ......................................................................................................... 3
    2.01 - Commencement of Term .......................................................................... 3
    2.02 - Term of Lease .......................................................................................... 4
    2.03 - Surrender of Premises ............................................................................. 4
    2.04 - Option to Extend ...................................................................................... 4
ARTICLE 3 .................................................................................................................. 4
Rent ........................................................................................................................ 4
    3.01 - Minimum Rent .......................................................................................... 4
    3.02 - Intentionally Deleted ................................................................................ 6
    3.03 - Delinquent Payments .............................................................................. 6
    3.04 - Additional Rent ........................................................ Error! Bookmark not defined.
    3.05 - Definition of Lease Year and Partial Lease Year ...................................... 6
    3.06 - Place of Payments ................................................................................... 6
ARTICLE 4 .................................................................................................................. 6
Taxes ...................................................................................................................... 6
    4.01 - Real Property Taxes ................................................................................ 6
    4.02 - Tenant's Taxes ........................................................................................ 7
ARTICLE 5 .................................................................................................................. 8
Construction and Financing ..................................................................................... 8
    5.01 - Landlord's Work ....................................................................................... 8
    5.02 - Tenant's Work ......................................................................................... 8
    5.03 - Payment .................................................................................................. 8
    5.04 - Financing ................................................................................................. 9
ARTICLE 6 .................................................................................................................. 9
Conduct of Business by Tenant ............................................................................... 9
    6.01 - Use of Premises and Trade Name ........................................................... 9
    6.02 - Tenant's Operating Covenant .................................................................. 9
    6.03 - Intentionally Deleted ................................................................................ 9
    6.04 - Other Business Practices ......................................................................... 9
    6.05 - Marketing Fund ...................................................................................... 10
ARTICLE 7 ................................................................................................................ 10
Common Areas and Operating Costs ..................................................................... 10
    7.01 - Definition ................................................................................................ 10
    7.02 - Development of Common Areas .............................................................. 10
    7.03 - Use of Common Areas ........................................................................... 11
    7.04 - Common Area Costs .............................................................................. 11
ARTICLE 8 ................................................................................................................ 12
Energy and Utility Costs ........................................................................................ 12
    8.01 - Energy and Utility Charges ................................................................... 112
    8.02 - Miscellaneous Utility Provisions ............................................................ 12
ARTICLE 9 ................................................................................................................ 12
Fixtures, Alterations, Signs ................................................................................... 12
    9.01 - Installation By Tenant ............................................................................ 12
    9.02 - Removal and Restoration by Tenant ...................................................... 12
    9.03 - Signs, Awnings and Canopies ............................................................... 13
    9.04 - First Class Condition ............................................................................. 13
ARTICLE 10 .............................................................................................................. 13
Repairs and Maintenance ...................................................................................... 13
    10.01 - Landlord's Obligation to Repair ............................................................ 13
    10.02 - Tenant's Obligation to Repair ............................................................... 13
    10.03 - Article Not Applicable to Fire or Condemnation ..................................... 14
ARTICLE 11 .............................................................................................................. 14

Indemnity ........................................................................................................................ 14
    11.01 - Indemnity .......................................................................................................... 14
ARTICLE 12 ....................................................................................................................... 15
Insurance ........................................................................................................................ 15
    12.01 - General Liability Insurance ................................................................................ 15
    12.02 - Special Causes of Loss and Difference in Conditions Insurance ....................... 15
    12.03 - Insurance on Common Areas ............................................................................ 15
    12.04 - Increase in Fire Insurance Premium .................................................................. 16
    12.05 - Tenant to Share Insurance Costs ...................................................................... 16
    12.06 - Waiver of Subrogation ...................................................................................... 16
    12.07 - Policies .............................................................................................................. 16
ARTICLE 13 ....................................................................................................................... 17
Damage by Fire, Etc. ...................................................................................................... 17
    13.01 - Restoration of Premises .................................................................................... 17
    13.02 - Restoration During Last Two Years ................................................................... 17
    13.03 - Tenant's Obligation Upon Restoration ............................................................... 17
ARTICLE 14 ....................................................................................................................... 17
Eminent Domain .............................................................................................................. 17
    14.01 - Eminent Domain ................................................................................................ 17
    14.02 - Landlord Entitled to Award ................................................................................. 18
ARTICLE 15 ....................................................................................................................... 18
Bankruptcy and Default Provisions ................................................................................. 18
    15.01 - Events of Default and Conditional Limitation ..................................................... 18
    15.02 - Landlord's Remedies ......................................................................................... 19
ARTICLE 16 ....................................................................................................................... 20
Mechanics' Liens ............................................................................................................ 20
    16.01 - Mechanics' Liens .............................................................................................. 20
ARTICLE 17 ....................................................................................................................... 21
Assignments, Subleases and Other Transfers of Tenant's Interest ................................ 21
    17.01 - Limitations on Tenant's Rights ........................................................................... 21
    17.02 - Effect of Landlord's Consent ............................................................................. 21
ARTICLE 18 ....................................................................................................................... 22
Compliance with Government Orders .............................................................................. 22
    18.01 - Tenant to Comply ............................................................................................... 22
    18.02 - Failure to Comply .............................................................................................. 22
    18.03 - Environmental Matters ...................................................................................... 22
ARTICLE 19 ....................................................................................................................... 23
Subordination, Mortgagee's Rights and Assignment of Rents ........................................ 23
    19.01 - Subordination .................................................................................................... 23
    19.0 - Assignment of Rents .......................................................................................... 24
ARTICLE 20 ....................................................................................................................... 24
Entry to Premises ........................................................................................................... 24
    20.01 - Entry to Premises by Landlord .......................................................................... 24
ARTICLE 21 ....................................................................................................................... 24
Notices and Certificates ................................................................................................. 24
    21.01 - Notices ............................................................................................................... 24
    21.02 - Estoppel Certificate of Tenant .......................................................................... 25
ARTICLE 22 ....................................................................................................................... 25
Covenant of Quiet Enjoyment ........................................................................................ 25
    22.01 - Covenant of Quiet Enjoyment ........................................................................... 25
ARTICLE 23 ....................................................................................................................... 26
Miscellaneous Provisions ............................................................................................... 26
    23.01 - Holdover ............................................................................................................ 26
    23.02 - Limitation on Landlord's Personal Liability ........................................................ 26
    23.03 - Definition of Tenant's Allocable Share .............................................................. 26
    23.04 - Force Majeure ................................................................................................... 27
    23.05 - Intentionally Deleted ......................................................................................... 27
    23.06 - Changes and Additions ..................................................................................... 27
    23.07 - Attornment by Tenant ....................................................................................... 27
    23.08 - Anti Terrorism ................................................................................................... 28
    23.09 - Survival of Tenant's Obligations ........................................................................ 28
    23.10 - Effect of Landlord's Notice to Terminate ........................................................... 28

23.11 - Effect of Captions ............................................................................................................... 29
23.12 - Tenant Authorized to Do Business ..................................................................................... 29
23.13 - Execution in Counterparts .................................................................................................. 28
23.14 - Law Governing, Effect and Gender .................................................................................... 29
23.15 - Intentionally Left Blank ....................................................................................................... 29
23.16 - Complete Agreement .......................................................................................................... 29
23.17 - Intentionally Deleted .......................................................................................................... 29
23.18 - Intentionally Deleted .......................................................................................................... 29
23.19 - Security Agreement ............................................................................................................ 29
23.20 - Invalidity of Particular Provisions ....................................................................................... 30
23.21 - Execution of Lease by Landlord .......................................................................................... 30
23.22 - Relationship of the Parties .................................................................................................. 30
23.23 - Brokers ............................................................................................................................... 30
23.24 - Construction ....................................................................................................................... 30
23.25 - Intentionally Deleted .......................................................................................................... 30
23.26 - Audit ................................................................................................................................... 30
23.27 - United States Dollars .......................................................................................................... 31
23.28 - Other Tenants; Future Exclusives ...................................................................................... 31

# COMMERCIAL LEASE

THIS COMMERCIAL LEASE made this _____ day of _____ , 2019, by and between the following parties:

Landlord:    CPC OCEANFRONT DELAWARE, LLC

a limited liability company organized and existing under the laws of the State of Delaware with its mailing address for notices and a principal office at:

4722 HWY 17 BYPASS SOUTH
MYRTLE BEACH, SOUTH CAROLINA 29588
ATTN: PATRICK MARINO

hereinafter referred to as "Landlord," and

Tenant:    EPIC ARCADES SC LLC

a limited liability company organized and existing under the laws of the State of Delaware with its mailing address for notices and a principal office or residence at:

_____
_____

hereinafter referred to as "Tenant."

Tenant's Federal Tax Identification Number: _____.

1

# ARTICLE 1

## *Premises*

### 1.01 - Premises

Landlord hereby demises and leases to Tenant and Tenant hereby rents from Landlord those certain premises located in Space U on the first (1st) floor ("Space U") and Space D on the second (2nd) floor ("Space D," together with Space U, collectively, the "Premises") of that certain shopping center which is located in the City of Myrtle Beach, County of Horry, State of South Carolina and commonly known as "THEBlvd" (the "Shopping Center"). The Premises consist of approximately 11,517 square feet (which 11,517 square feet consists of approximately 5,371 square feet of interior floor area and approximately 1,018 square feet of exterior patio floor area for Space U and approximately 4,110 square feet of interior floor area and approximately 1,018 square feet of exterior patio floor area for Space D). For all purposes hereof, except the calculation of Rent, the Premises shall also include, and the Tenant shall have the use of in accordance with the terms of this Lease, the 2,995 roof deck identified as Suite 201 (the "Roof Deck"). The Premises are depicted on the plan attached hereto and made a part hereof as Exhibit A (the "Site Plan"). The Premises shall not be deemed to include either the land lying thereunder or the exterior walls or roof of the building in which said Premises are located or any area beyond the midpoint of any interior wall. Landlord reserves the use of said land, walls and roof of the building, together with the right to install, maintain, use, repair and replace pipes, ducts, conduits, wires and structural elements leading through the Premises that serve the Premises and/or other parts (now existing or hereafter added) of the Shopping Center, in locations which will not materially interfere with Tenant's use of the Premises.

### 1.02 - Shopping Center

Landlord reserves the right to add to or sever the ownership of or title to any portion of the Shopping Center. It is agreed that the depiction of the Shopping Center on the Site Plan does not constitute a representation, covenant or warranty of any kind by Landlord. Landlord, in its sole and absolute discretion, reserves the right to expand or remodel the Shopping Center and to change the configuration, size and dimensions of the Shopping Center, the number, location and dimensions of buildings, parking areas (if any), driveways (if any), entrances, exits and landscaped areas, the number of floors in any of the buildings, the dimensions, identity, and type of stores or tenancies, and, as provided in Section 7.02, the "Common Areas" (defined in Section 7.01); provided, however, no such changes will materially interfere with Tenant's access to the Shopping Center or Premises or abrogate any of Tenant's rights under Section 22.01 below.

### 1.03 - Use of Premises and Trade Name

Tenant shall operate the Premises under the trade name "_____" and shall use the Premises solely for the operation of a family entertainment center operating an arcade and coin operated game room, fully licensed bar and providing a variety of food items for purchase, and for no other purpose whatsoever. Tenant acknowledges and agrees that the sale of any alcoholic beverages in, at or from all or any part of the Premises is subject to Tenant obtaining, at Tenant's cost and expense, all required permits and authorizations from any applicable governmental authorities with respect thereto) [and Tenant secures dram shop or liquor liability coverage as more fully set forth in this Lease]. If such seating is permitted by the local authorities, Tenant may provide outdoor seating for its customers on the Roof Deck or exterior patio space that is part of the Premises at any time during the Term of this Lease. Tenant, at its sole cost, shall comply with all relevant state, municipal or local laws, regulations, rules or ordinances with respect to outdoor seating, and obtain all necessary permits or licenses for the same.

### 1.04 – Existing Exclusive and Tenant's Exclusive Use

In addition to the terms and limitations of this Section 1.04, as of the date of this Lease, Landlord has granted to other tenants and occupants of the Shopping Center the exclusive right to offer to sell certain goods and services as set forth in Exhibit D (the "Existing Exclusives") and Tenant shall not directly or indirectly violate any Existing Exclusive. Tenant covenants that Tenant shall indemnify Landlord for breach of the Existing Exclusives by Tenant or those acting by, through or under Tenant.

    (a)    Provided that Tenant is not in default under this Lease beyond any applicable cure period and is open and operating in the entire Premises in accordance with Sections 1.03 and 6.02 hereof, Tenant shall have the exclusive right within the Shopping Center to operate from its Premises more than two (2) coin-operated games (the "Tenant's Exclusive Use"). Notwithstanding anything contained herein to the contrary, Tenant's Exclusive Use shall

4/5/19

not apply to any existing tenants at the Shopping Center as of the date of this Lease and shall not preclude any tenant from operating from its respective premises as a slot machine parlor or video gambling café.

(b)    Provided that Tenant is not in default under this Lease beyond any applicable cure period and is open and operating in the entire Premises in accordance with Sections 1.03 and 6.02 hereof, in the event Tenant's Exclusive Use is violated as a result of the unauthorized actions of a tenant (or occupant) within the Shopping Center (e.g., operation of a use that violates Tenant's Exclusive Use by a tenant or occupant without the consent of Landlord and/or in contravention of the terms and conditions or such tenant's or occupant's permitted use pursuant to its lease or occupancy agreement (hereinafter referred to as a "Rogue Tenant")), Tenant shall be entitled to the following sole and exclusive remedy: from and after the date which is the later of (i) the date which is thirty (30) days after the date on which Landlord receives written notice from Tenant the Rogue Tenant is violating Tenant's Exclusive Use, and (ii) the first date upon which Landlord fails to undertake such commercially reasonable efforts and/or exhausts all available remedies of which Landlord may be entitled to seek to cause the violation of Tenant's Exclusive Use by the Rogue Tenant to cease (such period, the "Competing Use Cure Period"), then commencing on the first day of the calendar month immediately following expiration of the Competing Use Cure Period and for so long as the Tenant's Exclusive Use is being violated, Tenant shall be entitled to the sole and exclusive remedy of a fifty percent (50%) reduction in Fixed Annual Minimum Rent and Common Area Charge then in effect (collectively, the "Competing Use Alternative Rent"); provided, however, Tenant shall revert to paying the full scheduled rent immediately upon the cessation of the violation of Tenant's Exclusive Use.  Notwithstanding anything contained herein to the contrary, in the event that Tenant shall fail to notify Landlord of its claimed violation of this Section 1.04 within thirty (30) days following the later of the date an offending tenant opens for business or commences violating Tenant's Exclusive Use, the restriction contained herein shall be deemed waived and this Section 1.04 shall be of no further force and effect as to such tenant.

# ARTICLE 2

## Term of Lease

### 2.01 - Commencement of Term

(a) The term of this Lease shall commence on the date (hereinafter called "Term Commencement Date") that is the later of (i) June 1, 2019 and (ii) the date Tenant opens for the conduct of its business in the Premises. Notwithstanding anything to the contrary contained in this Section 2.01, during the period from the execution of this Lease through the Term Commencement Date, Tenant shall be obligated to observe and perform the obligations of Tenant which are set forth in this Lease, except that Tenant shall not be obligated to pay Fixed Monthly Minimum Rent or Additional Rent until the Term Commencement Date. The covenants, agreements and obligations herein contained, except as herein otherwise specifically provided, shall extend to, bind and inure to the benefit of the parties hereto and their respective personal representatives, heirs, successors and assigns.

(b) Landlord shall permit Tenant and Tenant's agents to enter the Premises prior to the Term Commencement Date in order that Tenant may do such work as may be required by Tenant to make the Premises ready for Tenant's use and occupancy (the "Fixturing Period").  If Landlord permits such entry prior to the Term Commencement Date, such permission is conditioned upon Tenant and its agents, contractors, employees and invitees working in harmony and not interfering with Landlord and its agents, contractors and employees in the performance of work at the Shopping Center on its own account of for other tenants and occupants of the Shopping Center.  If at any time such entry shall cause or threaten to cause disharmony or interference, Landlord shall have the right to withdraw such permission upon twenty-four (24) hours' notice to Tenant and Tenant's failure to cure such disharmony or interference within such period. Any entry into the Premises by Tenant prior to the Term Commencement Date shall be subject to all of the terms, covenants, conditions and provisions of the Lease, other than with respect to Tenant's obligation to pay rent or additional rent.  Tenant acknowledges and agrees that Landlord shall not be liable in any way for any injury, loss or damage which may occur to Tenant, its agents, contractors and employees or to Tenant's work and installations made in the Premises or to property placed therein prior to the Term Commencement Date, all of the same being at Tenant's sole risk.  Such entry shall not be construed as delivery of possession by Landlord or as an acceptance of the Premises by Tenant under the provisions of this Lease or as a waiver of any of the provisions hereof.

### 2.02 - Term of Lease

The term of this Lease shall expire on the last day of the tenth (10th) Lease Year (as defined below), unless extended or earlier terminated pursuant to the provisions herein.

4/5/19

## 2.03 - Surrender of Premises

On the expiration or earlier termination of this Lease, Tenant agrees, without necessity of any notice from Landlord (statutory or otherwise), to surrender the Premises in accordance with Article 9, and broom clean and in good order, repair and condition, reasonable wear and tear and damage by fire or casualty excepted.

## 2.04 - Option to Extend

If, on the date the applicable Extension Notice (as hereinafter defined) is given, and on the first day of the applicable Extended Term (as hereinafter defined): (i) this Lease is in full force and effect, and (ii) Tenant is not in breach of any of the terms, covenants or conditions of this Lease required to be observed or performed by Tenant; Tenant shall have the right to extend (an "Extension Option") the term of this Lease for two (2) additional periods of five (5) years (each such additional period, an "Extended Term"), provided that notice (the "Extension Notice") of the election shall be received by Landlord not less than nine (9) months prior to expiration of the then existing term of the Lease, time being of the essence with respect to the date of delivery of such notice. The Extended Term(s) shall be upon the same terms and conditions as are contained in this Lease for the initial term hereof, except that (1) Fixed Annual Minimum Rent for and during the Extended Term shall be as set forth in Section 3.01 with respect to the Extended Term(s), and (2) Tenant shall have no right to extend the term of this Lease for any period of time beyond the expiration of the Extended Term referred to above. Wherever used in this Lease in connection with the term of the Lease, the word "term" or "Term") shall refer to the initial term of this Lease together with the Extended Term to the extent timely elected, and qualified for, in accordance with the provisions of this Section 2.04.

## 2.05 – Permit Contingency

Tenant's obligations under this Lease are expressly conditioned (the "Permit Contingency") on Tenant obtaining evidence reasonably satisfactory to Tenant that governmental licenses and permits necessary for the improvements to, and use and operation of, the exterior patios appurtenant to Space U and Space D (the "Permits"). Tenant shall submit a full and complete application in connection with the Permit Contingency within thirty (30) days of the date of this Lease and shall thereafter diligently pursue approval thereof and timely respond to any comments of the governmental authorities having jurisdiction over the Premises (the "Submission Due Date"). Provided Tenant meets the Submission Due Date, and continues to pursue the Permits in an expeditious and diligent manner, Tenant shall have the right to terminate this Lease if Tenant is unable to receive the Permits. Upon receipt of the Permits, the Permit Contingency shall be deemed to be fully satisfied, this Lease shall continue in full force and effect in accordance with and subject to its terms, and thereafter Tenant shall have no right to terminate this Lease pursuant to this Section 2.05. In the event Tenant elects to terminate this Lease pursuant to this Section 2.05, Tenant shall immediately restore the Premises to the condition existing prior to the Term Commencement Date, which obligation shall expressly survive the termination of this Lease.

# ARTICLE 3

## *Rent*

## 3.01 - Minimum Rent

(a)     Commencing on the Term Commencement Date, Tenant agrees to pay Landlord, without diminution, deduction or set-off whatsoever and without prior notice or demand, and as fixed annual minimum rent ("Fixed Annual Minimum Rent"), the sums set forth below payable in equal consecutive monthly installments ("Fixed Monthly Minimum Rent") each in advance upon the first day of each calendar month during the term hereof.

| LEASE YEAR | FIXED ANNUAL MINIMUM RENT | FIXED MONTHLY MINIMUM RENT | RENT PER SQUARE FOOT |
|---|---|---|---|
| 1 | $     350,000.00 | $     29,166.67* | $30.389 |
| 2 | $     357,000.00 | $     29,750.00 | $30.998 |
| 3 | $     364,140.00 | $     30,345.00 | $31.617 |
| 4 | $     371,422.80 | $     30,951.90 | $32.249 |
| 5 | $     378,851.26 | $     31,570.94 | $32.894 |
| 6 | $     386,428.28 | $     32,202.36 | $33.552 |
| 7 | $     394,156.85 | $     32,846.40 | $34.223 |

4

| 8 | $ | 402,039.98 | $ | 33,503.33 | $34.908 |
|---|---|---|---|---|---|
| 9 | $ | 410,080.78 | $ | 34,173.40 | $35.606 |
| 10 | $ | 418,282.40 | $ | 34,856.87 | $36.318 |
| **FIRST EXTENSION TERM** | | | | | |
| 11 | $ | 426,648.05 | $ | 35,554.00 | $37.045 |
| 12 | $ | 435,181.01 | $ | 36,265.08 | $37.785 |
| 13 | $ | 443,884.63 | $ | 36,990.39 | $38.541 |
| 14 | $ | 452,762.32 | $ | 37,730.19 | $39.312 |
| 15 | $ | 461,817.57 | $ | 38,484.80 | $40.098 |
| **SECOND EXTENSION TERM** | | | | | |
| 16 | $ | 471,053.92 | $ | 39,254.49 | $40.900 |
| 17 | $ | 480,475.00 | $ | 40,039.58 | $41.718 |
| 18 | $ | 490,084.50 | $ | 40,840.37 | $42.553 |
| 19 | $ | 499,886.19 | $ | 41,657.18 | $43.404 |
| 20 | $ | 509,883.91 | $ | 42,490.33 | $44.272 |

*Fixed Monthly Minimum Rent, on the basis of $30.389/square foot, shall be reduced in accordance with Section 3.01(b) below to the extent that Space D opens after the Term Commencement Date but before June 1, 2020.

(b)     If the term shall commence upon a day other than the first day of a calendar month or if the term shall expire upon a day other than the last day of a calendar month, then Tenant shall pay, upon the Term Commencement Date, and on the first day of the last calendar month, a pro rata portion of the Fixed Monthly Minimum Rent for the first and last fractional calendar months of the term. Notwithstanding anything contained herein to the contrary, Tenant's obligation to commence paying Fixed Annual Minimum Rent and Additional Rent on account of Space D shall be as follows:

(i)     In the event Tenant opens for business from Space D after the Term Commencement Date but prior to July 1, 2019, Tenant's obligation to pay Fixed Annual Minimum Rent and Additional Rent on account of Space D shall not commence until such opening for business and the Fixed Monthly Minimum Rent shall be reduced on a per diem basis in an amount equal to the Fixed Minimum Monthly Rent on account of Space D (i.e., 5,128 square feet x $30.389 = $155,834.79/365 = $426.94) (the "Space D Per Diem").

(ii)     In the event Tenant opens for business from Space D after July 1, 2019, but on or before August 1, 2019, Tenant's obligation to pay Fixed Annual Minimum Rent and Additional Rent on account of Space D shall not commence until such opening for business and the Fixed Monthly Minimum Rent shall be reduced by the Space D Per Diem until Tenant opens for business from Space D, and then Tenant shall be obligated to pay 66% of Fixed Annual Minimum Rent and Additional Rent per square foot on account of Space D for the period commencing on the date of opening for business from Space D and ending on June 1, 2020, after which time Tenant shall resume paying full Rent.

(iii)     In the event Tenant opens Space D for business after August 1, 2019, Tenant's obligation to pay Fixed Annual Minimum Rent and Additional Rent on account of Space D shall not commence until such opening for business and the Fixed Monthly Minimum Rent shall be reduced by the Space D Per Diem until Tenant opens for business from Space D, and then Tenant shall be obligated to pay 33% of Fixed Annual Minimum Rent and Additional Rent per square foot on account of Space D for the period commencing on August 1, 2019 and ending on June 1, 2020, after which time Tenant shall resume paying full Rent.

(c)     Notwithstanding anything contained in this Lease to the contrary, provided Tenant is not then in breach of any of the terms, covenants or conditions of this Lease required to be observed or performed by Tenant, Tenant shall be entitled to a cash allowance of Five Hundred Fifty Thousand and 00/100 Dollars ($550,000.00) (the "Allowance"), which Allowance shall be paid by Landlord within thirty (30) days following the later of: (i) the date Tenant makes request for such payment, (ii) the date upon which one hundred percent (100%) of Tenant's Work is complete (as certified in writing by Tenant's architect), (iii) the date of submission to Landlord of lien waivers in a form reasonably satisfactory to Landlord and in accordance with the laws of the State in which the Shopping Center is located, executed by Tenant's general contractor and all subcontractors and suppliers that supplied labor or materials for or in connection with the Tenant's Work, evidencing that Tenant has paid all materialmen, suppliers and contractors for all labor and materials for all of the Tenant's Work and that all materialmen, suppliers and contractors of all labor and materials have released all liens, if any, and rights to lien in connection with the Premises and Tenant's Work, and (iv) the date Tenant opens for business to the public within the entire Premises pursuant to an unconditional certificate of occupancy.

4/5/19

## 3.02 – Intentionally Deleted

## 3.03 - Delinquent Payments

If during the term of this Lease Tenant fails to pay the full amount of the Fixed Monthly Minimum Rent or "Additional Rent" (defined in Section 3.04) when the same is due and payable, then interest at the monthly rate of two percent (2%) per month or the maximum rate then permitted by law, whichever is less, shall accrue on the unpaid amount from and after the date on which any such sum shall be due and payable, and such interest, together with a Late Charge of Two Hundred Fifty and 00/100 Dollars ($250.00) for each past due payment to cover the extra expense involved in handling such delinquency, shall be paid to Landlord at the time of payment of the delinquent sum. Landlord shall have the right to apply any payments made by Tenant first to any deficiency in the payment of the interest and administrative charges provided for hereunder. Any payment to be made by Tenant under this Lease shall be deemed to have been paid upon the date that it is received by Landlord. The provision for a Late Charge and interest herein shall not be deemed to grant Tenant any grace period or extension of time or prevent Landlord from exercising its other rights under this Lease. Tenant shall pay to Landlord an administrative fee of Two Hundred Fifty and 00/100 Dollars ($250.00) for each and every check submitted by Tenant which is dishonored. If Landlord receives from Tenant two or more checks which have been dishonored, all checks from Tenant thereafter shall, at Landlord's option, be either certified or cashier's checks.

## 3.04 - Additional Rent

All rents, charges, costs, expenses, reimbursements, fees, interest, and other payments to be made by Tenant to Landlord under this Lease, other than Fixed Annual Minimum Rent, shall be deemed to be "Additional Rent."

## 3.05 - Definition of Lease Year and Partial Lease Year

The term "Lease Year" is defined to mean a period of twelve (12) consecutive calendar months, the first of which shall commence on the Term Commencement Date and end on the day before the first anniversary of the Term Commencement Date. If the Term Commencement Date falls on a day other than the first day of a calendar month, then the initial fractional month in which the Term Commencement Date falls plus the next succeeding twelve (12) full consecutive calendar months constitutes the first Lease Year. In order to achieve uniformity in the operation of the Property, Landlord reserves the right to designate and change the beginning and ending day of the Lease Year, notice of which shall be given to Tenant.

## 3.06 - Place for Payments

Tenant shall deliver to Landlord all payments of Fixed Monthly Minimum Rent and Additional Rent at the office of Landlord shown at the beginning of this Lease or such other place as may be designated by Landlord.

# ARTICLE 4

## *Taxes*

## 4.01 - Real Property Taxes

(a)    Landlord will pay all real property taxes (which shall include property tax assessments, water and sewer rent rates and charges, parking and environmental surcharges, and any other governmental charges, general and special, ordinary and extraordinary) which may be levied or assessed by any lawful authority against land or improvements located in the Shopping Center (collectively "Real Property Taxes").

(b)    During the term of this Lease, Tenant shall pay to Landlord as Additional Rent, Tenant's Allocable Share of all Real Property Taxes. Tenant's Allocable Share shall be computed under Section 23.03(a) as of the first day of each respective Lease Year. If the Premises are separately assessed, then Tenant agrees to pay to Landlord, as Additional Rent, the amount of the Real Property Taxes separately assessed against the Premises including the land lying thereunder plus Tenant's Allocable Share of the Real Property Taxes assessed against the Common Areas of the Shopping Center.

4/5/19

(c)    Tenant shall pay to Landlord, as Additional Rent, all sums due pursuant to Section 4.01(b) in monthly installments, in advance and without prior notice or demand, on or before the first day of each month during the term of this Lease, in an amount estimated by Landlord, such that Landlord will have received the full amount of Tenant's Allocable Share of Real Property Taxes in time for payment to applicable taxing authority when due.  In the event Landlord is required to escrow Real Property Taxes, Landlord may, but shall not be obligated to, use the amount required to be escrowed as a basis for its estimate of the monthly installments due from Tenant hereunder. Landlord may apply the amounts paid by Tenant for Tenant's Allocable Share of Real Property Taxes to Real Property Taxes payable for any calendar year or portion thereof, without regard to when such Real Property Taxes actually accrued. Landlord shall furnish Tenant with a written statement of the actual amount of Tenant's Allocable Share of Real Property Taxes based upon the tax bills and/or assessment bills (as the case may be) for each tax fiscal year.  If the total amount paid by Tenant under this Section 4.01(c) for any tax fiscal year during the term of this Lease is less than the actual amount due from Tenant for such year as shown on such statement, Tenant shall pay to Landlord the deficiency within ten (10) days after demand therefor by Landlord.  If the total amount paid by Tenant hereunder for any year exceeds the amount due from Tenant for such year, Tenant shall be entitled to offset the excess against payments next thereafter becoming due under this Section 4.01(c).  For the tax fiscal years in which this Lease commences and expires, the provisions of this paragraph shall apply and, to the extent necessary, Tenant's liability for Tenant's Allocable Share of any Real Property Taxes for such year shall be subject to a pro rata adjustment based on the appropriate number of days of said tax fiscal years.  A copy of a tax bill and/or assessment bill (as the case may be) submitted by Landlord to Tenant shall at all times be sufficient evidence of the amount of Real Property Taxes to which such bill relates.

(d)    Landlord may seek a reduction in the assessed valuation (for Real Property Tax purposes) of the Shopping Center or any portion thereof by administrative or legal proceeding.  Tenant shall pay to Landlord Tenant's Allocable Share of Landlord's costs for said proceedings, including reasonable and customary counsel fees, appraisal fees and other similar expenses, within ten (10) days after Tenant's receipt of a statement from Landlord therefor. Tenant's Allocable Share of such costs shall be computed under Section 23.03(a) hereof.  Landlord shall reimburse Tenant for Tenant's Allocable Share of any refund of Real Property Taxes (after deducting any unpaid portion of Tenant's Allocable Share of Landlord's costs for such proceedings) resulting from any proceeding for which Tenant has paid Tenant's Allocable Share of Real Property Taxes.

(e)    Should any alteration or improvement performed by or for Tenant during the term of this Lease cause an increase in assessment, Tenant shall pay to Landlord the full cost of all Real Property Taxes resulting from such increase in assessment.  Any amount paid separately hereunder by Tenant to Landlord shall be in addition to any amounts paid by Tenant pursuant to Section 4.01(b).

(f)    Should any governmental taxing authority acting under any present or future law, ordinance or regulation, levy, assess or impose a tax, excise, surcharge or assessment upon or against the rents payable by Tenant to Landlord, or upon or against the Common Areas, whether by way of substitution for or in addition to any existing Real Property Tax or otherwise, Tenant shall be responsible for and shall pay Tenant's Allocable Share of such tax in the manner provided in Section 4.01(c).

## 4.02 - Tenant's Taxes

Tenant shall, at all times, be responsible for and pay, before delinquency, all municipal, county, state or federal taxes charged against Tenant's income, sales, fixtures, furnishings, equipment, stock-in-trade or other personal property of any kind owned, installed or used in or on the Premises, and any tax now or hereafter charged against Tenant on any other basis.

# ARTICLE 5

## *Construction and Financing*

## 5.01 - Landlord's Work

Landlord shall deliver possession of the Premises with the following utilities ready for connection by Tenant: HVAC, gas, water, sewer and electrical.  Except for the foregoing, Tenant agrees to accept the Premises in its "as-is" condition on the date possession of the Premises is made available to Tenant without any express or implied warranty concerning the condition of the Premises by Landlord or its agents, and Tenant agrees, at its sole cost and expense, to complete all improvements necessary to demise the Premises and prepare the Premises for the conduct of Tenant's business in the Premises in accordance with the terms of this Lease.

4/5/19

**5.02 - Tenant's Work**

(a)    Tenant shall, at its sole cost and expense perform "Tenant's Work" described in Exhibit C attached hereto and made a part hereof, in accordance with Tenant's Plans and all applicable Governmental Orders (as hereinafter defined).  Any item of Tenant's Work which Tenant requests Landlord to perform on the Tenant's behalf and which Landlord agrees to undertake shall be provided to Tenant at Tenant's additional cost, plus ten percent (10%) for overhead.  Tenant acknowledges its ability to perform Tenant's Work, and no delay in its performance shall cause or be deemed to cause any delay or postponement in the Term Commencement Date.

(b)    Tenant agrees, at Tenant's expense, to obtain and maintain for so long as Tenant's Work continues, public liability insurance, builder's risk property insurance covering Tenant's Work, and Workers' Compensation insurance adequate to fully protect Landlord, as well as Tenant, from and against any and all liability for death of or injury to persons or damage to property caused in or about the Premises, or by reason of the construction of Tenant's Work.  Tenant shall furnish to Landlord certificates evidencing said coverage prior to the commencement of Tenant's Work.

(c)    Tenant's Work shall be performed in accordance with plans and specifications approved by Landlord ("Tenant's Plans").  Tenant shall obtain Landlord's approval of Tenant's Plans prior to the commencement of any of Tenant's Work.  Tenant shall, within thirty (30) days after the execution of this Lease, submit to Landlord, for Landlord's prior written approval, complete architectural and engineering plans and specifications of the Premises as well as plans for Tenant's signage, prepared by licensed architects and engineers describing all the work which under this Lease is to be performed by Tenant, and showing in sufficient detail the location of all utilities, partitions, store front and any other matters which may affect the construction work to be performed by Landlord, if any, in the Premises and in the building of which the Premises form a part.  Landlord shall give Tenant written notice approving or disapproving of the plans and specifications within fifteen (15) days after the date Landlord receives same.  In the event that said plans and specifications are, in the commercially reasonable judgment of Landlord, incomplete, inadequate or inconsistent with this Lease, Landlord may elect to direct Tenant to have said plans and specifications revised, corrected and/or completed by Tenant at Tenant's expense.  Upon completion of final plans and specifications and Landlord's approval thereof, Tenant shall employ a licensed contractor and sub-contractors to complete the Demised Premises in accordance with Tenant's Plans and in accordance with the other terms and provisions of this Lease.

(d)    Tenant acknowledges that Landlord's approval of Tenant's plans (i) does not eliminate the need for Tenant to obtain all necessary approvals and permits required from any public or governmental agency or authority having jurisdiction over the Shopping Center and (ii) should not be construed as a waiver of or the satisfaction of any applicable Governmental Orders, conformance thereto being solely Tenant's responsibility.  Tenant also acknowledges that Landlord has no liability to Tenant or any other person or entity as a result of Landlord's approval of said plans for any defects, omissions, inconsistencies or shortcomings contained in such plans or the work to be performed in accordance therewith.

**5.03 - Payment**

Any payment to be made by Tenant to Landlord for any items of Tenant's Work which Tenant requests Landlord to perform and which Landlord agrees to undertake as provided in Section 5.02, shall be paid for by Tenant, as Additional Rent, within ten (10) days after receipt of a bill therefor.

**5.04 - Financing**

(a)    If Landlord can obtain approval of this Lease from a mortgagee for the purposes of financing or refinancing only upon the basis of modifications of terms and provisions of this Lease, Landlord shall have the right to terminate this Lease if Tenant refuses to approve any such modifications within thirty (30) days after Landlord's request therefor.  The lease modifications referred to herein shall not relate to those provisions pertaining to size or location of the Premises, length of the term, or amount of Fixed Annual Minimum Rent or Additional Rent.  Further, no such modification shall result in a materially interference with Tenant's access to the Shopping Center or Premises or abrogate any of Tenant's rights under Section 22.01 below.  If such right to terminate is exercised, this Lease shall thereafter be null and void, and neither party shall have any liability to the other by reason of such cancellation.

(b)    On or before the last day of January of each Lease Year following the date of this Lease, and immediately upon request by Landlord in connection with any financing or sale of the Shopping Center, Tenant or any Guarantor shall provide to Landlord financial statements for Tenant's or any Guarantor's last fiscal year, including a balance sheet, sales reports and statements of income.

4/5/19

# ARTICLE 6

## *Conduct of Business by Tenant*

### 6.01 - Use of Premises and Trade Name

Throughout the term, Tenant shall use the entire Premises solely for the purpose as set forth in Section 1.03 and shall operate its store in the Premises under the trade name set forth in Section 1.03. Tenant shall not use or permit, or suffer the use of the Premises, or any part thereof, for any other business or purpose or under any other trade name.

### 6.02 - Tenant's Operating Covenant

Tenant shall occupy the Premises on and after the Term Commencement Date and shall continuously operate its store in the entire Premises during the full term of this Lease. Tenant shall operate the Premises in a manner consistent with the majority of the other stores operated by Tenant as of the date hereof under the same trade name and having the same or similar use as the use as provided for in this Lease. Tenant shall use for office, storage, or other non-selling purposes only such space as is reasonably required for the proper operation of Tenant's retail business in the Premises. Except for national holidays, Tenant shall conduct its business in the Premises seven (7) days per week, except for the Roof Deck, which may but not necessarily shall be open from November 1 – March 31 yearly and which may close in the event of inclement weather any time of year. Tenant acknowledges and agrees that the Shopping Center's success is dependent upon the continued operation of Tenant's business, and that the maintenance of the character and quality of the Shopping Center is enhanced by the continued occupancy of the Premises and the regular conduct of Tenant's business as required herein.

### 6.03 - Other Business Practices

(a)     Tenant shall keep the Premises and all show windows and signs and any loading area and other areas allocated for the sole use of Tenant in good, neat and clean condition. Tenant shall keep the Premises and any service area contiguous to or part of the Premises free of debris, rubbish, garbage, pests, rodents and vermin and, upon two (2) days' notice by Landlord to Tenant of Tenant's failure to do so, Landlord may remove such debris, rubbish, garbage, pests, rodents and vermin and charge Tenant the actual cost of such removal plus eighteen percent (18%) for administration. Tenant shall be entitled to use the dumpsters located in the area identified on Exhibit E attached hereto.

(b)     Tenant shall load and unload its merchandise, equipment and supplies and remove its rubbish only by way of the loading area and service doors designated by Landlord for Tenant's use.

(c)     Tenant shall not commit nor permit any act or practice which may tend to injure the building occupied by Tenant, nor permit its equipment to be a nuisance to other tenants, nor keep merchandise on or obstruct the mall area or other areas outside the Premises, nor conduct or permit any fire, bankruptcy, auction or going-out-of-business sale, nor erect or retain any sign, light, lettering, inscription, symbol or mark which is not approved by Landlord, nor install any antenna, fixture, or improvement outside of the Premises, nor permit any loudspeaker, radio or television broadcast to be heard outside the Premises, nor sell or display merchandise outside the Premises.

(d)     Tenant agrees to store all trash and refuse in adequate containers within the Premises as depicted on Exhibit E and to maintain such containers in a healthy, safe, neat, odor free and clean condition and in a location so as not to be visible to members of the public shopping in the Shopping Center, and to attend to the daily disposal thereof in the manner designated by Landlord; and to conform to all rules and regulations which Landlord may make in the management and use of the Shopping Center requiring such conformance by Tenant and Tenant's employees. If the Premises are used for the sale of food, Tenant shall store all trash, refuse and garbage in a garbage storeroom or compartment which Tenant shall install and keep in good repair at its sole expense. Landlord may require that the Premises be periodically treated against pests, rodents or vermin, and in such event, Tenant will, at its sole cost and expense, enter into a contract with a professional pest control service for the performance of such work, which contract and service shall be subject to Landlord's prior approval.

(e)     Tenant shall comply with all further rules and regulations for the use and occupancy of the Shopping Center as Landlord from time to time promulgates for the best interests of the Shopping Center.

4/5/19

## 6.04 – Marketing Fund

(a)      Tenant shall make a contribution, in the manner set forth in Section 6.04, to a Marketing Fund to be administered by Landlord. The Marketing Fund will be used for advertising, customer services, promotion, public relations, market research and administrative expenses which, in the sole opinion of Landlord, will sustain and improve the market penetration and promotional needs of the Shopping Center; provided, however, Landlord shall not spend an amount in excess of ten percent (10%) for administrative fees on account of the Marketing Fund.

(b)      From and after the Term Commencement Date, Tenant shall pay to Landlord, as an annual contribution to the Marketing Fund, an annual amount equal to One and 00/100 Dollars ($1.00) per square foot of the Premises, which amount shall be paid in advance in consecutive equal monthly installments on the first day of each month during the term. For any Partial Lease Year during the term of this Lease, or for any partial month, the amount of Tenant's contribution to the Marketing Fund shall be adjusted on a pro-rata basis to reflect such Partial Lease Year or partial month.

(c)      Upon each anniversary of the Term Commencement Date during the term of this Lease, the amount of Tenant's annual contribution to the Marketing Fund then in effect shall increase by two percent (2%). Landlord acknowledges and agrees that upon thirty (30) days' notice, but no more than once per year, Tenant or its agents may audit Landlord's books and records concerning the Marketing Fund.

# ARTICLE 7

## Common Areas and Operating Costs

## 7.01 - Definition

The term "Common Areas" shall mean the interior and exterior areas and facilities within the Shopping Center which are:  (i) not leased to a tenant, or (ii) by nature not leasable to a tenant for the purpose of the sale of merchandise or the rendition of services to the general public.  Common Areas shall include but shall not be limited to all parking areas (if any) and facilities, driveways (if any), entrances and exits, truck serviceways and tunnels, utilities, water filtration and treatment facilities, retention ponds or basins located within or outside the Shopping Center, retaining and exterior walls, sidewalks, open and enclosed malls, outside courts, landscaped and planted areas, escalators, stairways, elevators, service corridors, service areas, loading docks, hallways, public restrooms, community rooms or areas, roofs, equipment, signs and any special services provided by Landlord for the common or joint use and benefit of all tenants in the Shopping Center, their employees, customers and invitees.

## 7.02 - Development of Common Areas

Landlord shall make available from time to time such Common Areas for the common benefit to the tenants and occupants of the Shopping Center as Landlord shall deem appropriate.  Landlord shall operate, manage, equip, heat, cool, ventilate, insure, repair and maintain such Common Areas for their intended purposes in such a manner as Landlord shall, in its sole discretion, determine.  Landlord shall at all times have the right to determine, change or alter the nature, extent, size or location of the Common Areas and Landlord shall not be subject to liability therefor, nor shall Tenant be entitled to any compensation or diminution or abatement of rent on account of any such determination or change, nor shall any such action be deemed an actual or a constructive eviction of Tenant; provided, however, no such determination, change or alteration shall result in a material interference with Tenant's access to the Shopping Center or Premises or abrogate any of Tenant's rights under Section 22.01 below .

## 7.03 - Use of Common Areas

Tenant and its officers, employees, agents, customers and invitees shall have the nonexclusive right, in common with Landlord and all others to whom Landlord has or may hereafter grant rights, to use the Common Areas as designated from time to time by Landlord, subject to such regulations as Landlord may from time to time impose. Tenant agrees to abide by such regulations and to use its best efforts to cause its officers, employees, agents, customers and invitees to conform thereto.  Landlord may at any time close temporarily the Common Areas or any portion thereof to make repairs or changes to prevent the acquisition of public rights therein, or to discourage noncustomer parking, and may do such other acts in and to the Common Areas as in its judgment may be desirable to improve the convenience thereof. Tenant shall not at any time interfere with the rights of Landlord and other tenants,

its and their permitted officers, employees, agents, customers, and invitees, to use any part of the Common Areas. Landlord shall have the sole and exclusive right to use the Common Areas for advertising purposes, promotions, exhibits, shows, displays, kiosks and such other similar uses.

## 7.04 - Common Area Costs

(a)    From and after the Term Commencement Date, Tenant shall pay to Landlord, as Additional Rent, monthly in advance on the first day of each month, a sum equal to one-twelfth (1/12) of the Common Area Charge. The "Common Area Charge" shall be an amount equal to Tenant's Allocable Share of the Common Area Costs (as hereinafter defined), calculated in accordance with Section 23.03(a) of this Lease, and subject to adjustment as provided herein.

(b)    "Common Area Costs" shall mean the total costs and expenses of every kind and nature incurred in operating, policing, protecting, managing, equipping, landscaping, lighting, repairing, replacing and maintaining the Shopping Center and the Common Areas, including but without limitation, such maintenance, repair, replacement and remodeling as shall be required in Landlord's sole and absolute judgment to preserve the utility thereof in the same condition and status as existed at the time of completion of the original construction. Common Area Costs may also include an administrative fee of ten percent (10%) of the total of such Common Area Costs for Landlord's overhead and administrative costs.

(c)    From and after the Term Commencement Date, Tenant shall pay to Landlord, without any deduction or setoff whatsoever, an estimate of the Common Area Charge, payable in equal monthly installments together with the Fixed Annual Minimum Rent payable hereunder. The foregoing amount shall be adjusted annually at the end of each Lease Year, which adjustment shall be based upon Landlord's reasonable estimation of the Common Area Costs.

(d)    Within a reasonable time after the end of each Lease Year, Landlord shall provide Tenant with a statement of the prior year's Common Area Costs which shall include a statement of the total deposits Tenant made toward such year's Common Area Costs and the Tenant's Allocable Share thereto, and the total payment made from the Marketing Fund. There shall be an appropriate adjustment made between Landlord and Tenant based thereon. If such adjustment shows a balance due to Landlord, such balance shall be payable by Tenant within thirty (30) days after delivery of the statement of the adjustment; if such adjustment shows a balance due to Tenant, then Tenant shall have a credit against the next payments of Fixed Annual Minimum Rent due Landlord in the amount of the balance due (or such shall be paid within thirty (30) days after its determination if after the expiration or termination of this Lease), in either case after first deducting therefrom any due and outstanding Rent then owed to Landlord. The foregoing shall survive the expiration or earlier termination of this Lease.

(e)    Landlord estimates Common Area Costs for the first Lease Year to be approximately $7.00 per square foot. Notwithstanding anything contained herein to the contrary, Common Area Charges shall not exceed 104% of the Common Area Charges for the immediately prior Lease Year, on a cumulative basis; provided, however, the foregoing cap shall not apply to any uncontrollable expenses, including, but not limited to, costs of utilities, capital expenditures (to the extent included within Common Area Costs). For the avoidance of doubt, any increases in Common Area Costs not recovered by Landlord due to the foregoing cap shall be carried forward into all succeeding calendar years during the Term and recouped by Landlord, subject to the foregoing 104% cap.

# ARTICLE 8

## *Energy and Utility Costs*

## 8.01 - Energy and Utility Charges

(a)    Prior to entering into possession of the Premises, Tenant shall make application to the appropriate local authority, municipality or other governmental agency to obtain direct service for Tenant's electric, natural gas and other utility requirements (except for Water Charges, as set forth below). Tenant shall be solely responsible for the cost of obtaining such services and the cost of providing and installing any required meters, conduits, wiring and other facilities and equipment, all of which shall be part of Tenant's Work. From and after the date Tenant first enters into possession of the Premises (or if the date Tenant obtains such energy service is sooner, then from and after the date such service begins), Tenant covenants and agrees to pay the authority, municipality or agency the cost of all energy provided to Tenant (including, but not limited to, all energy provided to the Premises, signage and any HVAC units serving the Premises) when due and payable.

4/5/19

(b)      From and after the date Tenant first enters into possession of the Premises, Tenant covenants and agrees to pay to the authority, municipality or agency all such costs and charges when due and payable on account of electric, water, sewer or sanitary charges.

## 8.02 - Miscellaneous Utility Provisions

(a)      Tenant shall not install within the Premises any equipment, fixtures or appliances which exceed the capacity of the utility facilities within or serving the Premises. If any such equipment, fixtures or appliances installed by Tenant requires additional utility facilities, the same shall be installed by Tenant at Tenant's sole cost and expense. Tenant agrees to use reasonable precautions to guard against the waste of energy.

(b)      Tenant agrees that Landlord shall not be responsible for any interruption of business or damage to the Premises resulting from interruption of utility service caused by any utility company or governmental regulatory agency.

# ARTICLE 9

## *Fixtures, Alterations, Signs*

## 9.01 - Installation By Tenant

Tenant shall not make or cause to be made any alterations, additions or improvements or install or cause to be installed any trade fixtures, exterior sign, floor covering, interior or exterior lighting, plumbing fixtures, shades or awnings, or make any changes to its store-front or interior decor without first obtaining Landlord's approval and consent in each instance. Tenant shall present to Landlord plans and specifications of such work at the time approval is sought and pay to Landlord a design review fee of Five Hundred and 00/100 Dollars ($500.00). All permitted alterations, additions or improvements shall be done in a good and workmanlike manner in compliance with all applicable Governmental Orders, and shall not interfere with the conduct of Tenant's normal business. Any alteration, addition or improvement done to the Premises by Tenant without Landlord's approval shall be immediately returned to its original condition at Tenant's expense upon request by Landlord at any time. All fixtures installed by Tenant shall be new or completely reconditioned.  Tenant hereby warrants that such fixtures will be free from defects in material and workmanship and designed, constructed and installed so as not to be hazardous to persons who may come on to the Premises.

## 9.02 - Removal and Restoration by Tenant

All alterations, additions, improvements or installations made by Tenant, or made by Landlord on Tenant's behalf and at Tenant's expense, shall upon installation become the property of Landlord. Tenant shall maintain all such alterations, additions and improvements in good order and repair and shall replace the same as needed through the term of this Lease. Such alterations, additions, and improvements shall not be removed from the Premises without the prior consent in writing from Landlord. Upon expiration of the term of the Lease or upon Tenant's vacating the Premises whether by abandonment, eviction, surrender, or otherwise prior to expiration of the term, all equipment permanently attached to the real estate or other personal property shall be deemed abandoned by Tenant and shall become the property of Landlord (unless, as a condition of its consent to install same, Landlord shall have required the subsequent removal thereof by Tenant). Tenant shall surrender all keys for the Premises to Landlord and shall inform Landlord of all combinations on locks, safes and vaults, if any, in the Premises. Within five (5) days following the expiration or earlier termination of this Lease, Tenant shall remove furnishings, equipment, trade fixtures and personal property from the Premises, or Landlord shall have the option of retaining, removing, or disposing of such property in its sole and absolute discretion, at Tenant's expense.  Tenant shall repair or cause to be repaired any damage to the Premises caused by such removal. Notwithstanding anything contained in this Section 9.02 to the contrary, prior to expiration of the Lease, Tenant may, at its sole option and cost, remove from the Premises arcade, amusement and gaming equipment installed by Tenant at the Premises and Tenant shall thereafter be responsible for restoring the Premises to the condition required at the time Tenant surrenders the Premises to Landlord pursuant to this Lease.

4/5/19

## 9.03 - Signs, Awnings and Canopies

Tenant will not place or maintain or suffer to be placed or maintained on or in an exterior door, wall or window of the Premises or the Shopping Center any sign, awning or canopy, decoration, lettering or advertising matter or other thing of any kind without first obtaining Landlord's written approval. Tenant further agrees (i) that any such sign, awning, canopy, decoration, lettering, advertising matter or other thing as may be approved shall be subject to applicable Governmental Orders, and (ii) to maintain such sign, awning, canopy, decoration, lettering, advertising matter or other thing as may be approved in good condition and repair at all times.

## 9.04 - First Class Condition

Tenant shall maintain the Premises in first class condition throughout the term of this Lease. Such maintenance for purposes of this Section 9.04 shall include, but not be limited to, replacing ceiling tiles, floor covering, interior decor, store front, fixtures and store signage, and bringing the Premises into compliance with any applicable Governmental Orders. Such maintenance shall be done at Tenant's sole cost and expense.

# ARTICLE 10

## *Repairs and Maintenance*

## 10.01 - Landlord's Obligation to Repair

Landlord agrees to repair and maintain the outside walls, structure and foundation of the building containing the Premises in good order and serviceable condition. Landlord shall not be required to commence any such repair until a reasonable time after written notice from Tenant that the same is necessary. There is excepted from this covenant the following, which shall be Tenant's responsibility:

(a)    Repair of damage caused by the act or omission of Tenant, its employees, agents, contractors, customers, invitees or licensees;

(b)    Repair of any loading areas not used in common with others; and

(c)    Repairs which are the responsibility of Tenant in accordance with Section 10.02.

## 10.02 - Tenant's Obligation to Repair

(a)    Tenant agrees, at its sole cost and expense, to repair and maintain the Premises in good order and condition, including but not limited to the non-structural portions of the Premises, including store front, loading areas, show windows, doors, windows, plate and window glass, ceilings, floor coverings, Tenant's HVAC systems, and the plumbing, sprinkler, electric and sewage systems, facilities, appliances, lighting fixtures and other systems and improvements located within or exclusively serving the Premises. In addition, Tenant shall be responsible, at its sole expense, for the repair and maintenance of its rooftop HVAC unit(s) (if any) and any other equipment or improvement located outside the Premises which is constructed or installed by Tenant or at Tenant's request. Tenant shall obtain Landlord's prior consent before making any repair or performing any maintenance which may adversely affect any aspect of the Shopping Center's operation.

(b)    During the entire term, Tenant agrees to maintain, at Tenant's sole cost, a maintenance contract with an independent HVAC contractor approved by Landlord covering at least the routine items of maintenance for Tenant's HVAC systems as are recommended by the manufacturer of such systems. Tenant agrees to provide Landlord with a copy of such HVAC service contract within thirty (30) days following the Term Commencement Date. Further, Tenant agrees during the entire term of this Lease to use the sprinkler service company designated by Landlord for any repairs or maintenance required for Tenant's sprinkler system.

(c)    If repairs are required to be made by Tenant pursuant to the terms of the Lease, Landlord may demand (but shall not be required to do so) that Tenant make the same forthwith, and if Tenant refuses or neglects to commence to such repairs and complete the same with reasonable dispatch after such demand, Landlord may make or cause such repairs to be made and shall not be responsible to Tenant for any loss or damage that may accrue to its stock or business by reason thereof. If Landlord makes or causes such repairs to be made, Tenant agrees that it will,

4/5/19

on demand, pay as Additional Rent to Landlord, the cost thereof, and an eighteen percent (18%) administration fee, and if Tenant defaults in such payment, Landlord shall have the remedies provided in Article 15 hereof.  Likewise, if repairs are required under the terms hereof to be made by Landlord and it fails or refuses after twenty (20) days' notice and demand by Tenant to commence such repairs and thereafter diligently prosecute same to completion, then Tenant shall have the right to make such required repairs.  Landlord shall reimburse Tenant for the cost of such repairs within twenty (20) days after receipt by Landlord of evidence of payment therefor by Tenant; however, Tenant shall have no right to offset such costs against the payment of Fixed Annual Minimum Rent or Additional Rent.

(d)     If Tenant's use of the Premises requires a grease trap, Tenant shall keep all drains and grease traps and "black iron" and other exhaust ducts and vents clean and reasonably free of grease and other debris.  Tenant further agrees to maintain, at Tenant's sole cost, a maintenance contract with an independent service contractor approved by Landlord to inspect, clean and repair such grease trap at such intervals as may be required by Tenant's use but in no event less frequently than once a month.

## 10.03 - Article Not Applicable to Fire or Condemnation

The provisions of this Article shall not apply to the repair of damage caused by fire, casualty, which matter is covered under Article 13, nor shall these provisions apply to a taking under the power of Eminent Domain, which matter is covered under Article 14.

# ARTICLE 11

## *Indemnity*

## 11.01 - Indemnity

To the maximum extent allowed by applicable law, Tenant will indemnify and hold harmless on a primary non-contributory basis Landlord, Landlord's managing agent (if any) and their respective officers, directors, employees, shareholders and agents and such other persons who are in privity of estate with Landlord, or to whom Landlord is legally responsible, from and against any and all claims, actions, damages, liabilities and expenses in connection with loss of life, personal injury, bodily injury or damage to property arising from or out of any occurrence in, upon or at the Premises, from or out of the occupancy or use by Tenant of the Premises or the Shopping Center or any part thereof, or occasioned wholly or in part by any act or omission of Tenant, its agents, contractors, employees, lessees, invitees or concessionaires or breach of any representation or covenant of Tenant.  In case Landlord, Landlord's managing agent or such other persons who are in privity of estate with Landlord, or to whom Landlord is legally responsible, shall be made a party to any action or proceeding commenced by or against Tenant, then Tenant agrees to protect and hold such parties harmless and to pay all costs, expenses and reasonable attorneys' fees incurred or paid by such parties in connection with such action or proceeding.  Tenant shall pay to such parties all costs, expenses and reasonable attorneys' fees that may be incurred or paid by Landlord in enforcing the terms, conditions, covenants and agreements in this Lease. The provisions of this Article 11 shall survive the expiration or earlier termination of the term of this Lease.

# ARTICLE 12

## *Insurance*

## 12.01 - General Liability Insurance

From the date Landlord delivers possession of the Premises to Tenant and through the last day of the term of this Lease, Tenant, at its sole cost and expense, for the mutual benefit of Landlord and Tenant, shall maintain personal injury and property damage liability insurance against claims for personal injury, bodily injury, death or property damage occurring on, in or about the Premises, or arising from, in or about Tenant's use of the Common Areas, or resulting from or arising out of products sold from the Premises or Tenant's use of the Common Areas during the term of this Lease, of not less than Three Million and 00/100 Dollars ($3,000,000.00) in respect of personal injury, bodily injury, death or property damage (combined single limit).  Such policy shall expressly contain a contractual endorsement to provide coverage for Tenant's indemnification set forth in Section 11.01 of this Lease and shall contain the "Per Location Aggregate" endorsement.  Such policy shall be endorsed (1) as primary and non-contributory and (2) to waive rights of subrogation against Landlord. Prior to the Term Commencement Date, Tenant shall provide Landlord with a certificate

containing evidence of such coverage and of the coverage required in Sections 12.02(c) and (d) below, and Tenant shall thereafter provide Landlord with appropriate evidence of said coverage upon each anniversary date of the policy. In the event that Tenant fails to provide the certificate as set forth herein or fails to provide such evidence of such coverage at least fifteen (15) days prior to the expiration date of each expiring policy, Landlord may obtain such insurance at Tenant's sole cost and expense and upon demand of Landlord, Tenant shall reimburse Landlord for the cost of procuring such insurance coverage together with eighteen percent (18%) for administration costs.

## 12.02 - Special Causes of Loss and Difference in Conditions Insurance

(a)     At all times during the term of this Lease, Landlord shall keep all Permanent Improvements, as hereinafter defined, insured for the benefit of Landlord against loss or damage by risks now or hereafter embraced by "Special Causes of Loss" and "Difference in Conditions" coverages and against such other risks as Landlord from time to time reasonably may designate in amounts sufficient to prevent Landlord from becoming a coinsurer under the terms of the applicable policies.  In any event, the amount applicable to "Special Causes of Loss" policies shall be not less than ninety percent (90%) of the "Then Full Replacement Cost" (being the cost of replacing the Permanent Improvements exclusive of the costs of excavations and footings below the lowest grade level).  The Then Full Replacement Cost shall be determined from time to time (but not more frequently than once in any twelve (12) calendar months) by an appraiser, architect or other person or firm designated by Landlord.

(b)     "Permanent Improvements" for purposes of this Lease shall be deemed to mean the building in which the Premises is situated, the appurtenances thereto and the equipment and other improvements constructed by Landlord and Tenant pursuant to Exhibits B and C.  Such Permanent Improvements shall exclude, however, Tenant's merchandise, trade fixtures, furnishings, equipment, wall covering, carpeting, drapes, and all personal property (collectively "Tenant's Personal Property").  Tenants shall provide Landlord with a certificate setting forth the cost of Tenant's Work no less than fifteen (15) days prior to the Term Commencement Date.

(c)     At all times during the term of this Lease, Tenant shall keep all of Tenant's Personal Property situated at or on the Premises, insured with "Special Causes of Loss" and "Difference in Conditions" coverages, and "Plate Glass" coverage (to the extent the Premises contains plate glass) for not less than the full replacement cost thereof, with any deductible but not to exceed One Thousand and 00/100 Dollars ($1,000.00) on "Plate Glass" and "Special Causes of Loss" and Ten Thousand and 00/100 Dollars ($10,000.00) on "Difference in Conditions" policies.

(d)     Tenant shall maintain, and shall cause all parties performing work on or about the Premises or on behalf of Tenant to maintain, statutory Workers' Compensation coverage according to the laws of the State of South Carolina and Employer's Liability coverage in limits of not less than One Million and 00/100 Dollars ($1,000,000.00).

## 12.03 - Insurance on Common Areas

At all times during the term of this Lease, Landlord shall keep the Common Areas insured for personal injury, bodily injury and property damage liability, "Special Causes of Loss" and "Difference in Conditions" property coverage, Workers' Compensation, Employer's Liability and any other casualty or risk insurance which Landlord or Landlord's insurance carrier deems necessary or appropriate.  If and to the extent Landlord elects to self-insure up to the first One Hundred Fifty Thousand and 00/100 Dollars ($150,000.00) of any claims for personal injury or bodily injury, or under Workers' Compensation, there shall be included within insurance costs the amount of any personal injury, bodily injury or Workers' Compensation claim(s) or judgment(s) paid by Landlord, limited, however, in each instance to the lesser of (i) One Hundred Fifty Thousand and 00/100 Dollars ($150,000.00), or (ii) the self-insured amount of such claim or judgment.

## 12.04 - Increase in Fire Insurance Premium

Tenant covenants and agrees to promptly pay to Landlord as Additional Rent, upon demand, the amount of any increase in the rate of insurance on the Premises or on any other part of the Shopping Center that results by reason of Tenant's act(s) or Tenant's permitting certain activities to take place.

## 12.05 - Tenant to Share Insurance Costs

(a)     During the term of this Lease, Tenant shall pay to Landlord as Additional Rent, Tenant's Allocable Share of all insurance costs incurred by Landlord under this Article 12.  Tenant's Allocable Share shall be computed under Section 23.03(a) as of the first day of each respective Lease Year.  If insurance costs are separately assessed against the Premises, Tenant agrees to pay to Landlord, as Additional Rent, the amount of the insurance costs, as

4/5/19

estimated by Landlord, separately assessed against the Premises plus Tenant's Allocable Share of the insurance costs, as estimated by Landlord, assessed against the Common Areas of the Shopping Center.

(b)    Tenant agrees to pay to Landlord, with respect to each subsequent insurance year, as Additional Rent, all sums due pursuant to Section 12.05(a), in monthly installments, in advance and without notice or demand, on or before the first day of each month during the term of this Lease, in an amount estimated by Landlord, such that Landlord will have received the full amount of Tenant's Allocable Share of insurance costs.  If the total amount paid by Tenant under this Section 12.05 for any insurance year during the term of this Lease is less than the actual amount due from Tenant for such year, Tenant shall pay to Landlord the deficiency within ten (10) days after demand therefor by Landlord.  If the total amount paid by Tenant hereunder for any insurance year exceeds the amount due from Tenant for such year, Tenant shall be entitled to offset the excess against payments next thereafter becoming due under this Section 12.05.  For the insurance years in which this Lease commences and expires, the provisions of this paragraph shall apply and Tenant's liability for its Allocable Share of any insurance for such year shall be subject to a pro rata adjustment based on the number of days of said years during which the term of this Lease is in effect.

## 12.06 - Waiver of Subrogation

Each party releases and waives on behalf of itself and on behalf of the insurers of such party's property, any and all claims and any rights of subrogation of any such insurer against the other party, its employees and agents for loss (other than loss or damage resulting from the willful act of such other party, its employees and agents) sustained from any peril to property required to be insured against herein, whether or not such insurance is actually in force, or from any peril to property actually insured against, though not required to be under this Lease.  The policies of the respective parties shall contain an express waiver of subrogation to this effect.

## 12.07 - Policies

All insurance provided in this Article 12 shall be effected under valid and enforceable policies of at minimum a Best rating of A-, XII and issued by insurers of recognized responsibility which are licensed to do business in the State of South Carolina.  All of Tenant's policies of insurance as required in this Article 12 shall name Landlord, Tenant, Landlord's managing agent (if any) and any mortgagee having an interest in any or all part of the Shopping Center the name and address of which Tenant has received written notice, as additional insureds, as their respective interests may appear.  Tenant agrees that such policies shall also be made payable, if required by Landlord, to a mortgagee or ground lessor, as the interest of such mortgagee or ground lessor may appear.  The loss, if any, under any policies provided for hereunder may be adjusted with the insurance company by Landlord.  Each of Tenant's policies shall contain an agreement by the insurer that such policy shall not be terminated, canceled or reduced in coverage without at least thirty (30) days' prior written notice to Landlord and to any mortgagee or ground lessor to whom a loss thereunder is payable.  The minimum limits of coverage for all of Tenant's policies of insurance required by this Article 12 shall be increased by Tenant if reasonably required by Landlord.

# ARTICLE 13

## *Damage by Fire, Etc.*

## 13.01 - Restoration of Premises

(a)    The parties hereto mutually agree that if the Premises are partially or totally destroyed or damaged by fire or otherwise, then Landlord (subject to being able to obtain all necessary permits and approvals therefor) shall repair and restore the Permanent Improvements of the Premises as soon as is reasonably practicable to substantially the same condition in which the Premises existed before such damage; provided that if the insurance proceeds collected or collectible and available to Landlord to pay the cost of such repairs and restorations by Landlord as a consequence of such destruction or damage are less than the cost of such repairs and restoration as estimated by Landlord's architect, Landlord shall not be obligated to commence or perform such repairs and restorations, and this Lease upon notice by Landlord to Tenant shall at the option of Landlord terminate unless Tenant undertakes (in form and upon terms satisfactory to Landlord) to pay the difference between such estimated cost and such insurance proceeds.  If, however, the Premises are completely destroyed or so damaged that Landlord cannot reasonably restore or rebuild in six (6) months after receipt of all required governmental approvals and permits to substantially the same condition in which the Premises were before such damage, then Landlord shall not be required to rebuild or restore, and this Lease shall be terminable by Landlord or Tenant serving written notice upon the other party within sixty (60) days after the date of such casualty.  In any event, if repairs have not been commenced within sixty (60) days after the

4/5/19

date on which Landlord receives the insurance proceeds, this Lease may be terminated by Tenant serving notice upon Landlord following the expiration of such sixty (60) days by giving Landlord not less than thirty (30) days' advanced written notice of such election, but in no event may Tenant terminate this Lease after such repairs have been commenced by Landlord.

(b)    In the event the Premises are completely or partially destroyed or so damaged by fire or other hazard that the Premises cannot be reasonably used by Tenant or can only be partially used by Tenant and this Lease is not terminated as above provided, an appropriate abatement shall be made in Fixed Annual Minimum Rent in proportion to that portion of the Premises that cannot be reasonably used by Tenant as a result of such fire or other hazard.

## 13.02 - Restoration During Last Two Years

Anything in Section 13.01 to the contrary notwithstanding, if, within two (2) years prior to the expiration of the initial term or at any time during any renewal term (if any) of this Lease the Premises shall be damaged or destroyed by fire or otherwise and the estimated cost of restoration exceeds One Hundred Fifty Thousand and 00/100 Dollars ($150,000.00), Landlord shall be under no obligation to repair and restore the Premises, and at the election of Landlord or Tenant by notice to the other within sixty (60) days after the date of such casualty the Lease shall terminate.

## 13.03 - Tenant's Obligation Upon Restoration

In the event of damage or destruction to the Premises and unless this Lease is terminated by Landlord or Tenant as provided in this Article 13, Tenant shall, as soon as possible, repair, redecorate and refixture the Premises (including, but not limited to, all items of Tenant's Personal Property) and restock the contents thereof in a manner and to at least a condition equal to that existing prior to its destruction or casualty, and reopen the entire Premises for business. All proceeds of insurance carried by Tenant on Tenant's Personal Property shall be held in trust for such purposes.

# ARTICLE 14

## *Eminent Domain*

## 14.01 - Eminent Domain

If the Premises, or such portion thereof as to render the balance wholly unsuitable for the purpose of Tenant, is taken by condemnation or the right of eminent domain, or by agreement between Landlord and those authorized to exercise such right (collectively the "condemnation proceedings"), either party upon written notice to the other shall be entitled to terminate this Lease provided that such notice is given not later than thirty (30) days after Tenant has received notice of such taking. Should any part of the Premises be so taken and should this Lease not be terminated in accordance with the foregoing provisions, Landlord covenants and agrees promptly after such taking to expend so much as may be necessary of the net amount which may be awarded to and received by it in such condemnation proceedings in restoring the Premises to an architectural unit as nearly like its condition prior to such taking as shall in the judgment of Landlord be practicable, with an appropriate abatement to be made in Fixed Annual Minimum Rent. Should the net amount so awarded to and received by Landlord be insufficient to cover the cost of restoring the Premises as estimated by Landlord's architect, Landlord may at its election, supply the amount of such insufficiency and restore the Premises, as above provided, or terminate this Lease. Where Tenant has not already exercised any right of termination accorded to it under this Section 14.01, Landlord shall notify Tenant of Landlord's election within ninety (90) days after the final determination of the amount of the award. Notwithstanding the foregoing, this provision shall not prevent Tenant from commencing a separate action against the condemning governmental authority for Tenant's cost to relocate the Premises (if any) and Tenant's loss of profit (if any) as a result of said condemnation, provided said action does not impact Landlord's action or award for said condemnation or eminent domain action.

## 14.02 - Landlord Entitled to Award

Out of any award for any such taking of the Premises or any part thereof, Landlord shall be entitled to receive and retain the amounts awarded for such Premises, except that Tenant shall be entitled to receive and retain only amounts which may be specially awarded to it in any such condemnation proceedings because of the taking of its trade fixtures and its leasehold improvements which have not become a part of the realty, and such business loss as Tenant shall specifically and separately establish, but not otherwise. It is understood in the event of the termination of this

4/5/19

Lease as aforesaid, Tenant shall have no claim against the Landlord or the condemning authority for the value of any unexpired term of its Lease and no right or claim to any part of the award on account thereof. Tenant hereby waives each such claim or right and assigns any such claim or right to Landlord.

# ARTICLE 15

## *Bankruptcy and Default Provisions*

### 15.01 - Events of Default and Conditional Limitation

(a)    If at any time prior to or during the term any one or more of the following events occurs, each such event shall constitute an "event of default":

(i)    Tenant or Tenant's Guarantor, if any, makes an assignment for the benefit of its creditors;

(ii)    Tenant or Tenant's Guarantor, if any, becomes insolvent;

(iii)    The leasehold estate hereby created in Tenant is taken on execution or by other process of law;

(iv)    Any petition is filed against Tenant or Tenant's Guarantor, if any, in any court, whether or not pursuant to any bankruptcy, reorganization, composition extension, arrangement or insolvency proceedings, and Tenant or Tenant's Guarantor is thereafter adjudicated bankrupt, or such petition is approved by the Court, or the Court assumes jurisdiction of the subject matter and such proceedings are not dismissed within ninety (90) days after the institution of the same; or any such petition is so filed by Tenant, or Tenant's Guarantor;

(v)    In any proceedings, a receiver or trustee is appointed for Tenant's property or the property of Tenant's Guarantor and such receivership or trusteeship is not vacated or set aside within ninety (90) days after the appointment of such receiver or trustee;

(vi)    There is a transfer or an attempted transfer of this Lease or of Tenant's interest thereof in violation of the restrictions set forth in Article 17 of this Lease;

(vii)    Tenant ceases operation in or vacates or abandons the Premises or otherwise fails to fully perform the obligations contained in Sections 6.01 and 6.02 of this Lease;

(viii)    Tenant fails to comply with any applicable Governmental Orders governing the use, handling and disposal of Hazardous Materials or is otherwise in violation of the obligations contained in Section 18.03 of this Lease;

(ix)    Tenant fails to comply with the obligations contained in Section 21.02 of this Lease;

(x)    Tenant or Tenant's Guarantor, if any, fails to pay any installment of the Fixed Annual Minimum Rent or Additional Rent or any portion of any such payment, when the same becomes due and payable, and such failure continues for ten (10) days after notice from Landlord to Tenant;

(xi)    Tenant or Tenant's Guarantor, if any, fails to pay any installment of the Fixed Annual Minimum Rent or Additional Rent or any portion of such payment, when same becomes due and payable, and such failure occurs on three (3) or more occasions in any Lease Year or Partial Lease Year;

(xii)    Tenant or Tenant's Guarantor, if any, fails to perform or observe any other requirement of this Lease (not hereinbefore specifically referred to) on the part of Tenant to be performed or observed and such failure continues for thirty (30) days after notice from Landlord to Tenant; or

(xiii)    Tenant fails to comply with the obligations contained in Section 1.03 of this Lease, and such failure continues for ten (10) days after notice from Landlord to Tenant; or where any such event shall occur on two or more occasions in any Lease Year or Partial Lease Year.

(b)    This Lease and the term are expressly subject to the conditional limitation that upon the happening of any one or more of the aforementioned events of default, Landlord, in addition to the other rights and remedies it

4/5/19

may have, shall have the right to immediately declare this Lease terminated and the term ended, in which event all of the right, title and interest of Tenant hereunder shall wholly cease and expire upon receipt by Tenant of a notice of termination. Tenant shall then quit and surrender the Premises to Landlord in the manner and under the conditions as provided for under this Lease, but Tenant shall remain liable as hereinafter provided.

## 15.02 - Landlord's Remedies

(a)    If this Lease shall be terminated as provided in Section 15.01, Landlord or Landlord's agents or employees may immediately or at any time thereafter re-enter the Premises and remove therefrom Tenant, its agents, employees, licensees, and any sub-tenants and other persons, firms or corporations, and all or any of its or their property therefrom, either by summary dispossess proceedings or by any suitable action or proceedings at law, in equity or by force, self-help or otherwise, without being liable to indictment or prosecution of damages therefor, and repossess and enjoy the Premises, together with all alterations, additions and improvements thereto.

(b)    In case of any such termination, re-entry or dispossession by summary proceedings or otherwise, the rents and all other charges required to be paid up to the time of such termination, re-entry or dispossession, shall be paid by Tenant, and Tenant also shall pay to Landlord all expenses which Landlord may then or thereafter incur for legal expenses, attorneys' fees, brokerage commissions and all other costs paid or incurred by Landlord as the result of such termination, re-entry or dispossession, and for restoring the Premises to good order and condition and for altering and otherwise preparing the same for reletting and for reletting thereof. Landlord may, at any time and from time to time, relet the Premises, in whole or in part, for any rental then obtainable either in its own name or as agent of Tenant, for a term which, at Landlord's option, may be for the remainder of the then current term of this Lease or for any longer or shorter period.

(c)    If this Lease is terminated as aforesaid, Tenant nevertheless covenants and agrees notwithstanding any entry or re-entry by Landlord whether by summary proceedings, termination or otherwise, to pay and be liable for on the days originally fixed herein for the payment thereof, amounts equal to the several installments of Fixed Annual Minimum Rent and Additional Rent reserved as they would, under the terms of this Lease, become due if this Lease had not been terminated or if Landlord had not entered or re-entered as aforesaid, and whether the Premises is relet or remains vacant in whole or in part or for a period less than the remainder of the term, and for the whole thereof. In the event the Premises be relet by Landlord, Tenant shall be entitled to a credit (but not in excess of the Fixed Annual Minimum Rent and Additional Rent reserved under the terms of this Lease) in the net amount of rent received by Landlord in reletting the Premises after deduction of all expenses and costs incurred or paid as aforesaid in reletting the Premises and in collecting the rent in connection therewith. At any time after the termination of the Lease, in lieu of collecting any monthly deficiencies, or any further monthly deficiencies, aforesaid, Landlord shall, at Landlord's option, be entitled to recover from Tenant, in addition to any other relief, such a sum as at the time of such termination represents the amount of the then present value, using a discount rate equal to eight percent (8%), of the total Fixed Annual Minimum Rent and Additional Rent and other benefits which would have accrued to Landlord under this Lease for the remainder of the Lease term, as if the Lease had been fully complied with by Tenant, less any monthly deficiencies for such period previously paid to Landlord by Tenant. Suit or suits for the recovery of the deficiency or damages referred to in this Section 15.02(c) or for any installment or installments of Fixed Annual Minimum Rent or Additional Rent hereunder, or for a sum equal to any such installment or installments, may be brought by Landlord all at once or from time to time at Landlord's election, and nothing in this Lease shall be deemed to require Landlord to await the date whereon this Lease or the term hereof would have naturally expired had there been no such default by Tenant or no such termination.

(d)    Intentionally deleted.

(e)    Tenant hereby expressly waives, so far as permitted by law, the service of any notice of intention to re-enter provided for in any statute, or of the institution of legal proceedings to that end, and Tenant for and on behalf of itself and all persons claiming through or under Tenant, also waives any and all right of redemption or re-entry or repossession under present or future laws, including any amendments hereafter, or to restore the operation of this Lease. Landlord and Tenant, so far as permitted by law, waive and will waive trial by jury in any action, proceeding or counterclaim brought by either of the parties hereto against the other on any matters whatsoever arising out of or in any way connected with this Lease, the relationship of Landlord and Tenant, Tenant's use or occupancy of the Premises, or any claim or injury or damage. The terms "enter," "re-enter," "entry" or "re-entry" as used in this Lease are not restricted to their technical legal meaning. In the event Landlord commences any proceedings for the recovery of possession of the Premises or to recover for non-payment of Fixed Annual Minimum Rent or Additional Rent, Tenant shall not interpose any non-compulsory counterclaim in any such proceeding. This may not, however, be construed as a waiver of Tenant's rights to assert such claim in any separate action or actions initiated by Tenant.

19

4/5/19

(f)        No failure by Landlord to insist upon the strict performance of any covenant, agreement, term or condition of this Lease or to exercise any right or remedy consequent upon a breach thereof, and no acceptance of full or partial rent during the continuance of any such breach shall be deemed an accord and satisfaction thus Landlord may accept any check or payment without prejudice to Landlord's rights to recover the balance due, nor shall it constitute a waiver of any such breach or of such covenant, agreement, term and condition, and this Lease shall continue in full force and effect with respect to any other then existing or subsequent breach thereof.  Tenant shall pay to Landlord within ten (10) days after demand therefor all amounts incurred by Landlord from time to time to enforce this Lease or any of the terms, covenants and provisions hereof, including without limitation attorneys fees, expert fees and court costs.

(g)        In the event of any breach or threatened breach by Tenant of any of the covenants, agreements, terms or conditions contained in this Lease, Landlord shall be entitled to enjoin such breach or threatened breach and shall have the right to invoke any right or remedy allowed at law or in equity, by statute or otherwise.

(h)        Each right and remedy of Landlord provided for in this Lease shall be cumulative and shall be in addition to every other right or remedy provided for in this Lease or now or hereinafter existing at law or in equity, by statute or otherwise.

# ARTICLE 16

## *Mechanics' Liens*

### 16.01 - Mechanics' Liens

(a)        If any mechanics' liens are filed against the Premises or any portion of the Shopping Center based upon any act of Tenant or anyone claiming through Tenant, Tenant shall hold Landlord harmless from all damages, claims and expenses arising therefrom, and Tenant, after notice from Landlord (or any person in privity of estate with Landlord), shall forthwith commence such action by bonding, deposit, payment or otherwise as will remove or satisfy such lien within fifteen (15) days.  In the event Tenant does not remove or satisfy said lien within said fifteen (15) day period, Landlord shall have the right to do so by posting a deposit, bond or undertaking, and Tenant agrees to reimburse Landlord for any and all expenses incurred by Landlord in connection therewith five (5) days after receipt by Tenant of Landlord's invoice therefor.  These expenses shall include, but not be limited to, filing fees, legal fees and bond premiums.

(b)        Nothing in this Article 16 shall be deemed or construed as (i) Landlord's consent to any person, firm or corporation for the performance of any work or services or the supply of any materials to the Premises or any improvement thereon, or (ii) giving Tenant of any other person, firm or corporation any right to contract for or to perform or supply any work, services or materials that would permit or give rise to a lien against the Premises or any part thereof.

# ARTICLE 17

## *Assignments, Subleases and Other Transfers of Tenant's Interest*

### 17.01 - Limitations on Tenant's Rights

(a)        Neither this Lease nor the interest of Tenant in this Lease shall be sold, assigned, transferred, mortgaged, pledged, hypothecated or otherwise disposed of, whether by operation of law or otherwise, nor shall the Premises or any part thereof be sublet or subject to any license or concession without the prior written consent of Landlord in each instance.  The sale or transfer of a controlling interest in Tenant or Tenant's Guarantor shall be considered for the purpose of this Lease to be an assignment, and likewise shall require Landlord's prior written consent, except where Tenant or Tenant's Guarantor is a corporation having its shares traded on the New York, American or Over-The-Counter stock exchange or market.  Similarly, if Tenant is a limited liability company or a partnership, the interest of any member or partner, respectively, shall not be transferred without Landlord's prior written consent.  For the purposes of this Lease, the entering into of any management agreement or any similar agreement which transfers control of the business operations of Tenant in the Premises shall be treated as an assignment of this Lease and shall require Landlord's prior written consent.  Any attempted transfer, assignment, subletting, license or

20

concession agreement, hypothecation or other transfer herein that is prohibited without Landlord's prior written consent shall be void and confer no rights upon any third party.

(b)    No permitted assignment made shall be effective until there are delivered to Landlord (i) an agreement, in recordable form, executed by Tenant and the proposed assignee, wherein such assignee assumes due performance of the obligations of Tenant's part to be performed under this Lease to the end of the term hereof and (ii) a written consent to such assignment by the holder of any fee or leasehold mortgage affecting the Premises to which this Lease is then subject and such consent shall have been obtained and delivered to Landlord if so required by the terms of such mortgage or by a collateral document securing the same obligations as are secured by such mortgage.

(c)    Any assignment of this Lease or any sublease affecting the Premises or any other permitted transfer hereunder shall be subject and subordinate to the full terms and conditions of this Lease. Regardless of either the assumption by any assignee or sublessee of due performance or the Landlord's acceptance of rent or other charges from such assignee or sublessee, Tenant shall not be released by any assignment or sublease but shall continue to be fully responsible for the due performance of Tenant's obligations hereunder in the same manner and to the same extent as if no such assignment or sublease had been made.

## 17.02 - Effect of Landlord's Consent

(a)    Any consent by Landlord to a sale, assignment, sublease, mortgage, pledge, license, concession, hypothecation, or transfer of this Lease, shall apply only to the specific transaction thereby authorized and shall not relieve Tenant from the requirement of obtaining prior written consent of Landlord to any further sale, assignment, sublease, mortgage, pledge, hypothecation, or transfer of this Lease. When the consent of Landlord is required hereunder to any proposed assignment or sublease of this Lease, or to the mortgaging, pledging, licensing, concession or hypothecation of this Lease, contemporaneously with the request of Tenant therefor, Tenant shall submit in writing information reasonably sufficient to enable Landlord to make a decision with respect thereto.

(b)    With respect to any of the consents requested by Tenant, whether or not the Landlord has consented thereto, Tenant shall pay to the Landlord all reasonable counsel fees and disbursements and all other expenses incurred by the Landlord in connection therewith.

# ARTICLE 18

## *Compliance with Government Orders*

### 18.01 - Tenant to Comply

Tenant, at its own expense, shall promptly execute and comply with all statutes, ordinances, rules, orders, regulations and requirements of the federal, state and local governments and of any and all other departments and bureaus applicable to the Premises or to the business conducted by Tenant at the Premises, whether ordinary, extraordinary, foreseen or unforeseen and obtain all permits and approvals required by all governmental authorities having jurisdiction over the Premises ("Governmental Orders"). In addition, Tenant, at its own expense, shall comply promptly with and execute all rules, orders, regulations and recommendations of the Board of Fire Underwriters, Rating Board and Landlord and Tenant's insurance companies with respect to the prevention of fires and the exposure of liability risks ("Insurance Matters"). Tenant, at its own expense, shall furnish and maintain in good order an adequate number and type of fire extinguishers on the Premises at all times. As part of complying with Governmental Orders, Tenant, at its own expense, shall at all times comply with and shall cause the Premises to be in compliance with the requirements of the Americans With Disabilities Act of 1990, and any additions, amendments or modifications thereto and all related regulations (the "ADA").

### 18.02 - Failure to Comply

In case Tenant fails or neglects to comply with any of the Governmental Orders, Insurance Matters or the ADA (as hereinafter defined) as herein required of Tenant, then Landlord or its agent may enter the Premises and make said repairs and comply with any and all of the Governmental Orders, Insurance Matters or the ADA at the cost and expense of Tenant, and in case Tenant fails to pay therefor upon notice within five (5) days thereafter, the said cost and expenses, including ten percent (10%) for administration costs, shall be added to the next month's installment of Fixed Annual Minimum Rent and be due and payable as such or Landlord may deduct the same from any balance remaining

4/5/19

in Landlord's hands. This provision is in addition to the right of Landlord to terminate this Lease by reason of default on the part of Tenant.

## 18.03 - Environmental Matters

(a)    As part of complying with Governmental Orders, Tenant covenants and agrees that it shall, at all times, comply with all Environmental Laws relating to the Premises. Tenant shall not engage in or permit any operations or activities upon, or any use or occupancy of the Premises, or any portion thereof for the purpose of or for in any way involving the handling, manufacture, treatment, storage, use, generation, release, discharge, refining, dumping or disposal of any Hazardous Material except in compliance with Environmental Laws and only in the course of legitimate business operations of the Premises.  Tenant shall not introduce, install or construct nor permit the introduction, installation or construction in the Premises of any material or substance which contains a Hazardous Material or which contains a material or substance which may be a Hazardous Material upon release or discharge in any form or state. Landlord will have the right, but not the duty, to inspect the Premises at any time to determine whether Tenant is complying with the terms of this Section.  If Tenant is not in compliance with this Section, Landlord shall have the right to immediately enter upon the Premises and take whatever actions Landlord deems reasonably necessary to comply with the terms of this Section of the Lease including, but not limited to, the removal from the Premises of any Hazardous Material and the restoration of the Premises, to a clean, neat, attractive, healthy and sanitary condition.  Tenant shall pay all costs incurred by Landlord in the performance of this work plus eighteen percent (18%) for administration within ten (10) days after receipt of a bill therefore.  The covenants in this Section 18.03 shall survive the expiration or earlier termination of the Lease.

(b)    As used herein, the term "Hazardous Material" shall mean any material waste or material substance which is (i) included within the definition of "hazardous substances", "hazardous materials", "toxic substances", or "solid waste" in or pursuant to any Environmental Law or subject to regulation under any Environmental Law; (ii) listed in the United States Department of Transportation Optional Hazardous Materials Table, 49 C.F.R. Section 172.101 enacted as of the date hereof or hereafter amended, or the United States Environmental Protection Agency List of Hazardous Substances and Reportable Quantities, 40 C.F.R. Part 301 enacted as of the date hereof or as hereinafter amended; or (iii) an explosive, radioactive, asbestos, polychlorinated biphenyl, oil or petroleum product, excluding, however, common maintenance and cleaning products in quantities regularly found at properties with a standard of operation comparable to the Premises and which are in compliance with all Environmental Laws.

(c)    As used herein, the term "Environmental Laws" shall mean all present and future federal, state and local laws, statutes, rules, ordinances and regulations relating to pollution or protecting human health or the environment including, without limitation, laws, statues, rules, ordinances and regulations relating to emissions, discharges, releases of hazardous substances, or otherwise relating to the manufacture, processing, distribution, use, treatment, storage, disposal, transport or handling of Hazardous Substances including, without limitation, the Comprehensive Environmental Response, Compensation and Liability Act of 1980, 42 U.S.C. §§ 9601 et seq.; the Resource Conservation and Recovery Act of 1976, 42 U.S.C. §§ 6901 et seq.; the Toxic Substance Control Act, 15 U.S.C. §§ 2601 et seq.; the Water Pollution Control Act (also known as the Clean Water Act), 33 U.S.C. § 1251 et seq.; the Clean Air Act, 42 U.S.C. § 7401 et seq.; and the Hazardous Materials Transportation Act, 49 U.S.C. § 1801 et seq.; the Safe Drinking Water Act, 21 U.S.C. § 349; 42 U.S.C. § 201 and § 300 et seq.; the National Environmental Policy Act of 1969, 42 U.S.C. § 4321; the Superfund Amendment and Reauthorization Act of 1986, codified in scattered Sections of 10 U.S.C., 29 U.S.C., 33 U.S.C. and 42 U.S.C.; and Title III of the Superfund Amendment and Reauthorization Action, 40 U.S.C. § 1101 et seq., as the same may be hereafter amended or modified.

(d)    Tenant will indemnify and hold harmless Landlord, Landlord's managing agent and such other persons who are in privity of estate with Landlord, or to whom Landlord is legally responsible, from and against any and all claims, actions, damages, liabilities and expenses including reasonable attorneys fees as a result of or with respect to (i) any environmental claim relating to or arising from the Premises, (ii) the violation of any Environmental Law in connection with the Premises, (iii) in connection with the release, spill, presence or threat of release of any Hazardous Material, upon, in or affecting all or any portion of the Premises, (iv) any environmental claim arising from the use, occupancy and operation of the Premises or the Shopping Center or any part thereof by Tenant, its agents, contractors, employees, lessees or concessionaires, or (v) any breach by Tenant of its obligations under this Section 18.03.

(e)    Upon the expiration or earlier termination of the term of this Lease, Tenant shall, at its sole cost and expense: (i) remove any and all Hazardous Materials then located in the Premises from the Premises and the Shopping Center in compliance with all applicable Environmental Laws; and (ii) dispose of same in compliance with all applicable Environmental Laws.

4/5/19

(f)        The provisions of this Section 18.03 shall survive the expiration or earlier termination of the term of this Lease.

# ARTICLE 19

## Subordination, Mortgagee's Rights and Assignment of Rents

### 19.01 – Subordination

(a)        The rights and interests of Tenant under this Lease shall be subject and subordinate to any ground lease, mortgage or trust deed now or hereafter placed upon any portion of the Shopping Center, and to any advances made thereunder, and to the interest thereon, and to all renewals, modifications, consolidations, replacements, extensions and re-financings thereof. Tenant agrees that any ground lessor, mortgagee or trustee may elect to give the rights and interest of Tenant under this Lease priority over the lien of its ground lease, mortgage or trust deed. In the event of such election, the rights and interest of Tenant under this Lease automatically shall have priority in whole or in part, over the lien of said ground lease, mortgage or trust deed, and no additional consent or instrument shall be necessary or required. However, Tenant agrees to execute and deliver whatever instruments may be requested by any ground lessor, mortgagee or trustee for such purposes so long as such instrument provides that, so long as Tenant is not in default under the Lease, Tenant's quiet enjoyment of the Premises shall not disturbed, and in the event Tenant fails to do so within ten (10) days after demand in writing, Tenant does hereby make, constitute and irrevocably appoint Landlord as its attorney-in-fact (which shall be deemed to be coupled with an interest) and in its name, place and stead so to do.

(b)        So long as any such ground lease, trust deed or mortgage remains a lien on any portion of the Shopping Center, Tenant agrees, simultaneously with the giving of any notice to Landlord which is required to be given by this Lease, to give a duplicate copy thereof to the respective ground lessor, mortgagee or trustee. Landlord agrees to notify Tenant of any ground lessor, mortgagee or trustee to whom such notice must be sent. Further, Tenant agrees that if Landlord defaults in its performance of any of the covenants under this Lease and if such default entitles Tenant to terminate this Lease, the ground lessor, mortgagee or trustee may cure said default within a reasonable period of time beyond any time period required of Landlord, and, if necessary, be permitted entry upon the Premises for the purpose of curing any such default. The giving of any such notice to Landlord shall not be properly given under the terms of this Lease and shall be of no force and effect until a duplicate copy thereof is also given to the ground lessor, mortgagee or trustee pursuant to this Section 19.02.

(c)        The parties hereto mutually agree that so long as any ground lease, mortgage or trust deed is a lien upon the Premises, they will not reduce the rents below that provided for in this Lease, provide for payments of rent prior to the time herein provided for, nor terminate this Lease prior to the end of the term, except as otherwise provided in this Lease, without first obtaining the written consent of the ground lessor, mortgagee or trustee, and that any such proposed modification or termination without the written consent of said ground lessor, mortgagee or trustee shall be void as against said ground lessor, mortgagee or trustee.

### 19.03 - Assignment of Rents

(a)        With reference to any assignment by Landlord of Landlord's interest in this Lease, or the rents payable hereunder, conditional in nature or otherwise, which assignment is made to the holder of a mortgage or ground lease on property which includes the Premises, Tenant agrees:

(i)        that the execution thereof by Landlord, and the acceptance thereof by the holder of such mortgage or the ground lessor, shall never be treated as an assumption by such holder or ground lessor any of the obligations of Landlord hereunder, unless such holder or ground lessor shall, by notice sent to Tenant, specifically otherwise elect; and

(ii)        that except as aforesaid, such holder or ground lessor shall be treated as having assumed Landlord's obligations hereunder with respect only to those obligations that arise following a foreclosure or deed in lieu thereof, or assumption of Landlord's position by a ground lessor only upon foreclosure of such holder's mortgage and the taking of possession of the Premises, or, in the case of a ground lessor, the assumption of Landlord's position hereunder by such ground lessor. Tenant agrees that with respect to those obligations of Landlord that arise prior to a foreclosure or deed in lieu thereof, or assumption of Landlord's position by a ground lessor, such foreclosing mortgagee in possession or ground lessor shall have no liability.

23

4/5/19

(b)      Where a party acquires Landlord's interest in property (whether land only, or land and buildings) which includes the Premises, and simultaneously leases the same back, such acquisition shall not be treated as an assumption of Landlord's position hereunder, and this Lease shall thereafter be subject and subordinate at all times to such lease.

# ARTICLE 20

## *Entry to Premises*

### 20.01 - Entry to Premises by Landlord

Landlord shall have the right to enter the Premises at all reasonable times for the purposes of: (i) inspecting the same, (ii) making any repairs to the Premises and performing any work therein that may be necessary or desirable, (iii) exhibiting the Premises for the purpose of sale, ground lease, mortgage or other financing, (iv) exhibiting the Premises (within one year prior to the expiration of the term of this Lease) to prospective tenants. Nothing in this Lease shall imply any duty on the part of Landlord to do work or perform obligations which, under any of the provisions of this Lease, Tenant may be required to perform, and the performance thereof by Landlord shall not constitute a constructive eviction nor a waiver of Tenant's default.

# ARTICLE 21

## *Notices and Certificates*

### 21.01 - Notices

(a)      Any notice, statement, certificate, request or demand required or permitted to be given or delivered in this Lease (a "notice") shall be in writing, and sent by either: (i) national overnight courier service (such as Federal Express) which provides tracking information and proof of delivery in their normal course of business; or (ii) registered or certified mail, postage prepaid, return receipt requested and addressed to Landlord at the address shown at the beginning of this Lease, and to Tenant at the address shown at the beginning of this Lease, or to such other addresses as Landlord or Tenant shall designate in the manner herein provided. Any such notice, statement, certificate, request or demand shall, in the case of: (x) overnight courier, be effective upon confirmation of delivery; or (y) registered or certified mailing, be deemed to have been given on the date mailed as aforesaid in any post office or branch post office regularly maintained by the United States Government, except in case for notice of change of address or revocation of a prior notice, which shall only be effective upon receipt or refusal.

(b)      At any time or times when Tenant's interest herein is vested in more than one person, firm or corporation, jointly, in common or in severalty, a notice given by Landlord to any one such person, firm or corporation shall be conclusively deemed to have been given to all such persons, firms or corporations. Any notices by Tenant pursuant to the provisions hereof shall be void and ineffective unless signed by all such persons, firms and corporations, unless all such persons, firms and corporations have previously given notice to Landlord, signed by each of them and designating and authorizing one or more of them to give the notice referred to, and such notice shall then be unrevoked by any notice to Landlord.

(c)      A copy of any notice required or permitted to be given to Landlord under the Lease shall also be sent in manner provided above to:

> Dubin Singer PC
> Attn: Richard Dubin
> 123 North Wacker Drive, Suite 1600
> Chicago, Illinois 60606

4/5/19

## 21.02 - Estoppel Certificate of Tenant

Within ten (10) days after request by Landlord or Landlord's ground lessor or mortgagee, Tenant, from time to time and without charge, shall deliver to Landlord or the requesting party, or to a person, firm or corporation, specified by Landlord, a duly executed and acknowledged instrument, certifying: (i) that this Lease is unmodified and in full force and effect, or if there has been any modification, that the same is in full force and effect as modified, and identifying the date of any such modification; (ii) whether Tenant knows or does not know, as the case may be, of any default by Landlord in the performance by Landlord of the terms, covenants and conditions of this Lease, and specifying the nature of such defaults, if any; (iii) whether or not there are any then-existing permitted set-offs or defenses by Tenant, and if so, specifying them; (iv) the dates to which the Fixed Annual Minimum Rent and Additional Rent have been paid; (v) that the operation and use of the Premises do not involve the generation, treatment, storage, disposal or release of any Hazardous Material or a solid waste into the environment and that the Premises is being operated in accordance with all environmental laws, zoning ordinances and building codes; and (vi) such other information as Landlord or Landlord's ground lessor or mortgagee may reasonably request.  Such certification shall not estop Tenant from thereafter asserting any existing default of which Tenant did not have actual knowledge on the date of execution thereof.

# ARTICLE 22

## *Covenant of Quiet Enjoyment*

## 22.01 - Covenant of Quiet Enjoyment

(a)    Tenant, subject to the terms and provisions of this Lease and on payment of the Fixed Annual Minimum Rent and Additional Rent and observing, keeping and performing all of the terms and provisions of this Lease on its part to be observed, kept and performed, shall lawfully, peaceably and quietly have, hold and enjoy the Premises and Common Areas during the term hereof on and after the Term Commencement Date without hindrance or ejection by any persons lawfully claiming under Landlord (and Landlord's successors and assigns); but it is understood and agreed that this covenant, and any and all other covenants of Landlord (and its successors and assigns) contained in this Lease shall be binding upon Landlord and its successors and assigns only with respect to breaches occurring during its and their respective ownership of Landlord's (and its successors' and assigns') interest hereunder.  If Landlord is unable to place Tenant in possession of the Premises at the Term Commencement Date by reason of the possession of the Premises by another tenant or occupant holding over under a lease or license agreement, such inability by Landlord shall not constitute a default under this Lease; but the Term Commencement Date shall be postponed until such date as such holdover tenant gives up possession of the Premises and the term of this Lease shall be deemed to commence on such Term Commencement Date as postponed.

(b)    With respect to any services to be furnished by Landlord to Tenant, Landlord shall in no event be liable for failure to furnish the same when prevented from doing so by strike, lockout, breakdown, accident, order or regulation of or by any governmental authority, or failure of supply, or inability by the exercise of reasonable diligence to obtain supplies, parts or employees necessary to furnish such services, or because of war or other emergency, or for any cause beyond Landlord's control.  In no event shall Landlord ever be liable to Tenant for any indirect or consequential damages by reason of Landlord's breach or default of the terms of this Lease.

# ARTICLE 23

## *Miscellaneous Provisions*

## 23.01 - Holdover

(a)    It is expressly understood by Tenant that Tenant's right to possession of the Premises under this Lease shall terminate at the expiration or earlier termination of the term, and should Tenant continue thereafter to remain in possession, Landlord, should it so elect, shall be entitled to the benefits of all provisions of law with respect to summary recovery of possession from a holdover tenant.  Tenant shall indemnify and save harmless Landlord from any claim, damage, expense, cost or loss which Landlord may incur by reason of such holding over, including without limitation, any claim of a succeeding tenant, or any loss by Landlord with respect to a lost opportunity to re-let the Premises.

4/5/19

(b)    Should Tenant continue to occupy the Premises after the expiration or earlier termination of the term, such tenancy shall be from month-to-month, and such month-to-month tenancy shall be under the same terms, covenants and conditions as set forth in this Lease, except that Tenant shall pay Fixed Annual Minimum Rent on the basis of two (2) times the Fixed Annual Minimum Rent for the last year of the term.

## 23.02 - Limitation on Landlord's Personal Liability

(a)    It is understood and agreed that Tenant shall look solely to the estate and property of Landlord in the Shopping Center for the satisfaction of Tenant's remedies for the collection of a judgment (or other judicial process) requiring the payment of money by Landlord in the event of any default or breach by Landlord with respect to any of the terms, covenants and conditions of the Lease to be observed or performed by the Landlord, and any other obligation of Landlord created by or under this Lease, and no other property or assets of Landlord or of its partners, beneficiaries, co-tenants, shareholders, members, or principals (as the case may be) shall be subject to levy, execution or other enforcement procedures for the satisfaction of Tenant's remedies. In no event shall Tenant name Landlord's partners, members, beneficiaries, co-tenants, shareholders or principals to any suit or other proceeding to which Tenant and/or Landlord are a party arising out of or relating to this Lease, unless the naming of such partners, members, beneficiaries, co-tenants, shareholders or principals is required in order to permit the Tenant to obtain jurisdiction over Landlord herein.

(b)    The term "Landlord," as used in Section 23.02(a) and throughout this Lease, shall be limited to mean and include only the owner or owners at the time in question of Landlord's interest in this Lease. Further, in the event of any transfer by Landlord of Landlord's interest in this Lease, Landlord herein named (and in case of any subsequent transfers or conveyances, the then assignor), including each of its partners, beneficiaries, co-tenants, shareholders, members, or principals (as the case may be), shall be automatically freed and relieved, from and after the date of such transfer or conveyance, of all liability for the performance of any covenants and agreements on the part of Landlord.

## 23.03 - Definition of Tenant's Allocable Share

(a)    "Tenant's Allocable Share" for purposes of this Lease shall be the product of multiplying the amount of the applicable charge (e.g., Real Property Taxes, Common Area Costs, insurance costs) separately by a fraction, the numerator of which is the number of square feet of the Premises as set forth in Section 1.01, and the denominator of which is the total number of square feet of all buildings leasable in the Shopping Center on the date as of which such computation is required to be made under the terms of this Lease. As of the date of this Lease, Tenant's Allocable Share is 29.17%.

(b)    Whenever used herein, the term "square feet" shall consist of the area of floor space on all floors measured from the outside face of all exterior walls of the buildings (or the midpoints of any interior walls), any outdoor sales areas which are mechanically heated or air-conditioned, the Roof Deck, and any other exterior patio or similar areas to the extent part of the premises of a tenant or occupant. It shall not include the floor area of any roof structures used for mechanical equipment.

## 23.04 - Force Majeure

The period of time during which either party is prevented or delayed in any performance or the making of any improvements or repairs or fulfilling any obligation under this Lease, other than the payment of Fixed Annual Minimum Rent and Additional Rent, due to unavoidable delays caused by fire, catastrophe, strikes or labor trouble, civil commotion, Acts of God, the public enemy, acts of terrorism, governmental prohibitions or regulations or inability to obtain materials by reason thereof, or any other causes beyond such party's reasonable control, shall be added to such party's time for performance, and such party shall have no liability by reason of such delay, except that as a condition to Tenant's right to avail itself of Force Majeure, Tenant must give Landlord written notice of such claimed Force Majeure not later than three (3) business days following the occurrence of such Force Majeure.

## 23.05 – Landlord's Consent

Any time Landlord's consent or approval is required under this Lease, except as expressly set forth herein, such consent or approval shall not be unreasonably withheld or delayed.

4/5/19

## 23.06 - Changes and Additions

Landlord hereby reserves the right at any time, and from time to time, to make alterations or additions to, and to build additional stories on the building in which the Premises are located and to build adjoining the same and to enter the Premises as necessary in connection therewith. Landlord also reserves the right at any time, and from time to time, to construct other buildings and improvements, to enlarge or otherwise modify the Shopping Center, to make alterations therein or additions thereto, to build additional stories on any building or buildings within the Shopping Center, to build adjacent thereto, to construct decks or elevated parking facilities, to install, maintain, use, repair and replace ducts, wires, pipes and conduits passing through or under the Premises serving other parts (now existing or hereafter added) of Shopping Center, to relocate or replace the HVAC units and any other rooftop or other improvements which are located outside the Premises but serving the Premises, whether in conjunction with the addition of stories to the building or otherwise, to enter the Premises as necessary in connection with any of the foregoing provisions of this sentence, and to sell or lease any part of the Shopping Center. The purpose of the Site Plan is to show the approximate location of the Premises within the Shopping Center, and Landlord reserves the right at any time to relocate the various buildings and Common Areas shown on the Site Plan; provided, however, that there shall not be caused thereby any unreasonable obstruction of Tenant's right of access to the Premises or any unreasonable interference with Tenant's use of the Premises for the purpose hereinabove set forth.

## 23.07 - Attornment by Tenant

If at any time during the term of this Lease the Landlord hereunder shall be the holder of a leasehold estate covering premises which include the Premises, and if such leasehold estate shall be canceled or otherwise terminated prior to the expiration date thereof and prior to the expiration of the term of this Lease, or in the event of the surrender thereof whether voluntary, involuntary or by operation of law, Tenant shall make full and complete attornment to the lessor of such leasehold estate for the balance of the term of this Lease upon the same covenants and conditions as are contained herein so as to establish direct privity between such lessor and Tenant and with the same force and effect as though this Lease was made directly from such lessor to Tenant. Tenant shall then make all rent payments thereafter directly to such lessor. In the event any proceedings are brought for the foreclosure of, or in the event of conveyance by deed in lieu of foreclosure of, or in the event of the exercise of the power of sale under, any mortgage or deed of trust made by Landlord covering the Premises, or in the event Landlord sells, conveys or otherwise transfers its interest in the Shopping Center or any portion thereof containing the Premises, Tenant shall attorn to and hereby covenants and agrees to execute an instrument in writing reasonably satisfactory to the new owner whereby Tenant attorns to such successor in interest and recognizes such successor as the Landlord under this Lease.

## 23.08 - Anti Terrorism

(a)    None of Tenant, any Guarantor, nor any of their respective constituents, investors (direct or indirect and whether or not holding a legal or beneficial interest) or affiliates, any of their respective brokers or other agents, if any, acting or benefiting, directly or indirectly, in any capacity in connection with the transaction contemplated by this Lease (collectively, the "Interested Parties") is in violation of any Governmental Orders, including but not limited to Executive Order No. 13224 on Terrorist Financing, effective September 24, 2001, and relating to Blocking Property and Prohibiting Transactions With Persons Who Commit, Threaten to Commit, or Support Terrorism, (the "Executive Order"), or the Uniting and Strengthening America by Providing Appropriate Tools Required to Intercept and Obstruct Terrorism Act of 2001 (Public Law 107-56, the "Patriot Act").

(b)    None of the Interested Parties are a "Prohibited Person" which is defined as (i) a person that is listed in the Annex to, or is otherwise subject to the provisions of, the Executive Order; (ii) a person owned or controlled by, or acting for or on behalf of, any person that is listed in the Annex to, or is otherwise subject to the provisions of, the Executive Order; (iii) a person with whom Landlord is prohibited from dealing or otherwise engaging in any transaction by any terrorism or money laundering Laws, including the Executive Order and the Patriot Act; (iv) a person who commits, threatens or conspires to commit or supports "terrorism" as defined in the Executive Order; (v) a person that is named as a "specially designated national and blocked person" on the most current list published by the U.S. Treasury Department Office of Foreign Assets Control at its official website, http://www.treas.gov/ofac/tl lsdn.pdf or at any replacement website or other replacement official publication of such list; or (vi) a person who is affiliated with a person who would be deemed a Prohibited Person pursuant to subsections (i) through (v) above.

4/5/19

(c)      None of Interested Parties are or will at any time hereafter (1) conduct any business or engage in any transaction or dealing with any Prohibited Person, including the making or receiving of any contribution of funds, goods or services to or for the benefit of any Prohibited Person, (ii) deal in, or otherwise engage in any transaction relating to, any property or interests in property blocked pursuant to the Executive Order or the Patriot Act, or (iii) engage in or conspire to engage in any transaction that evades or avoids, or has the purposes of evading or avoiding, or attempts to violate, any of the prohibitions set forth in the Executive Order or the Patriot Act.

(d)      Tenant covenants and agrees to deliver to Landlord any certification or other evidence requested from time to time by Landlord in its reasonable discretion, confirming compliance with this Section 23.08.

(e)      (i) None of the funds or other assets of the Interested Parties constitute property of, or are beneficially owned, directly or indirectly, by any Embargoed Person (as defined below); (ii) no Embargoed Person has any interest of any nature whatsoever in Tenant or any Guarantor, as applicable (whether directly or indirectly); and (iii) none of the funds of Tenant or any Guarantor, as applicable, have been derived from any unlawful activity with the result that the engagement of Tenant or any Guarantors, as applicable (whether directly or indirectly) is prohibited by Governmental Orders or the transaction contemplated by this Lease is in violation of Governmental Orders. "Embargoed Person" means any person, entity or government subject to trade restrictions under Governmental Orders, including but not limited to, the International Emergency Economic Powers Act, 50 U.S.C. §§ 1701 et seq., The Trading with the Enemy Act, 50 U.S.C. App. 1 et seq., and any Executive Orders or regulations promulgated thereunder with the result that the engagement of Tenant or any Guarantor, as applicable (whether directly or indirectly), is prohibited by Governmental Orders or the transaction contemplated by this Lease is in violation of applicable Governmental Orders.

## 23.09 - Survival of Tenant's Obligations

Any sums due Landlord from Tenant that by the terms herein would be payable, or are incapable of calculation, until after the expiration or earlier termination of this Lease shall survive and remain a continuing obligation until paid. Any obligations of Tenant under this Lease that are not performed, or are incapable of being performed, until after the expiration or earlier termination of this Lease shall survive and remain a continuing obligation until performed.

## 23.10 - Effect of Landlord's Notice to Terminate

Any right on the part of Landlord to terminate this Lease shall, when exercised, require no further act, to the end that at the expiration of the applicable time period, if any, contained in the particular termination provision, this Lease and the term hereunder shall end and expire as fully and completely as if such termination date was the date herein definitely fixed for the end and expiration of this Lease and the term hereof, and upon such date Tenant shall quit and surrender the Premises to Landlord.

## 23.11 - Effect of Captions

The captions, bold-faced type, underlining, notational references, or legends in this Lease are inserted only for convenient reference or identification of the particular paragraphs.  They are in no way intended to describe, interpret, define or limit the scope, extent or interest of this Lease, or any paragraph or provision thereof.

## 23.12 - Tenant Authorized to Do Business

Tenant represents, warrants and covenants that it is upon the date of execution, and throughout the term of this Lease it shall be authorized to do business and in good standing in the State of South Carolina.  Tenant, if a partnership or corporation, agrees to furnish to Landlord, upon request, evidence of authority for entering into this Lease.

## 23.13 - Execution in Counterparts

This Lease may be executed in one or more counterparts, any one or all of which shall constitute but one agreement.

## 23.14 - Law Governing, Effect and Gender

This Lease, and any dispute concerning this Lease, shall be governed by the internal substantive laws of the State of South Carolina without regard to its conflict of laws provisions, and any dispute concerning an interpretation of any portion of the Lease or the conduct of the parties hereunder shall be brought in South Carolina.  Tenant hereby

4/5/19

consents to service of process at the Premises in the event that Tenant does not maintain a separate business office within the State of South Carolina.  This Lease shall be binding upon and inure to the benefit of the parties hereto and their respective legal representatives, successors and permitted assigns, except as expressly provided otherwise.  Use of the neutral gender shall be deemed to include the masculine and feminine.

## 23.15 - Intentionally Left Blank

## 23.16 - Complete Agreement

This Lease contains and embraces the entire agreement between the parties hereto with respect to the matters contained herein, and it or any part of it may not be changed, altered, modified, limited, terminated, or extended orally or by any agreement between the parties unless such agreement is in writing and signed by the parties hereto, their legal representatives, successors or assigns.  Tenant acknowledges and agrees that neither Landlord nor any representative of Landlord nor any broker has made any representation to or agreement with Tenant relating to the Premises, this Lease or the Shopping Center which is not contained in the express terms of this Lease.  Tenant acknowledges and agrees that Tenant's execution and delivery of this Lease is based upon Tenant's independent investigation and analysis of the business potential and expenses represented by this Lease, and Tenant hereby expressly waives any and all claims or defenses by Tenant against the enforcement of this Lease which are based upon allegations of representations, projections, estimates, understandings or agreements by Landlord or Landlord's representative that are not contained in the express terms of this Lease.   This Lease is in English, and to the extent a version of this Lease has been provided in a language other than English, it was only for convenience, without any representation or warranty as to its accuracy; this English version shall control and the non-English version is not, in any way, a part of this Lease.

## 23.17 – Intentionally Deleted

## 23.18 - Intentionally Deleted

## 23.19 - Security Agreement

Tenant hereby grants Landlord a security interest in all inventory, equipment (including but not limited to trade fixtures, shelving and furniture) and merchandise, now or hereafter located on or in the Premises in which Tenant has any interest whether now or hereafter acquired, and in all proceeds realized therefrom including accounts and general intangibles arising therefrom (collectively, the "Collateral"), to secure the payment and performance of Tenant's obligations set forth in this Lease.  Tenant hereby appoints Landlord its true and lawful attorney-in-fact in its name or otherwise to do any and all acts and to execute and file any and all documents which may be necessary to realize, perfect, continue, preserve and protect the security interest upon the Collateral.  Tenant hereby authorizes Landlord, at its option, to file financing or continuation statements or amendments to financing statements by any method or medium authorized by any applicable filing office, naming Tenant as debtor with respect to any of the Collateral.  Upon the occurrence of any event of default pursuant to Section 15.01, Landlord shall be entitled to exercise all of the rights and remedies of a secured party under the Uniform Commercial Code of the State of South Carolina, as amended from time to time.  Costs of retaking, disposition, holding, processing and preparing the Collateral for disposition together with court costs and reasonable attorney's fees and disbursements of the Landlord in enforcing any right or exercising any remedy under this Security Agreement shall be deemed a part of the obligations secured by the Collateral.

## 23.20 - Invalidity of Particular Provisions

If any term or provision of this Lease or the application thereof to any person or circumstance is, to any extent, invalid or unenforceable, the remainder of this Lease, or the application of such term or provision to persons or circumstances other than those as to which it is held invalid or unenforceable, shall not be affected thereby, and each term and provision of this Lease shall be valid and be enforced to the fullest extent permitted by law.

## 23.21 - Execution of Lease by Landlord

The submission of this document for examination and negotiation does not constitute an offer to lease, or a reservation of, or option for, the Premises, and this document shall be effective and binding only upon the execution and delivery hereof by both the Landlord and Tenant.

4/5/19

## 23.22 - Relationship of the Parties

Nothing contained herein shall be deemed or construed by the parties hereto nor by any third party as creating the relationship of principal and agent or of partnership or of joint venture between the parties hereto, it being understood and agreed that neither the method of computation of rent nor any other provision herein contained, nor any acts of the parties hereto, shall be deemed to create any relationship between the parties hereto other than landlord and tenant.

## 23.23 - Brokers

Landlord and Tenant each represent and warrant to the other that neither of them has employed any realtors or brokers in connection with the negotiation of this Lease. Landlord and Tenant shall each indemnify, defend and hold harmless the other from any cost, expense or claim for brokerage or other commission arising from or out of any breach of the foregoing representation and warranty. The provisions of this Section 23.23 shall survive the expiration or earlier termination of the term of this Lease.

## 23.24 - Construction

This Lease has been negotiated at arm's length by both parties after advice by counsel or other representatives chosen by such parties. In the event of any controversy, dispute or contest over the meaning, interpretation, validity or enforceability of the Lease or any of its terms or conditions, the parties agree that the normal rules of construction, to the effect that any ambiguities are to be construed against the drafting party, shall not be employed in the interpretation of this Lease or any amendments or exhibits hereto.

## 23.25 - Intentionally Deleted

## 23.26 - Audit

Tenant may, at any time after at least five (5) business days' notice to Landlord given within six (6) months after Tenant receives a statement or demand pursuant to Article 4, Article 7 and/or Article 12 pertaining to Tenant's responsibility on account of Tenant's Share of Real Property Taxes, Tenant's Share of Common Area Costs and/or Tenant's Share insurance premiums, as the case may be, review Landlord's records of each of Real Estate Taxes, Common Area Costs and Insurance, as the case may be for the time period covered by such statement or demand. If the review of Landlord's books and records discloses that Tenant's Allocable Share paid by Tenant for the period under review exceeded the actual amount properly allocable to Tenant, then, so long as Tenant is not in default under any of its obligations under this Lease, Landlord shall (i) credit against Tenant's next accruing Rent obligations an amount equal to such excess, and (ii) if such excess is greater than three percent (3%) of the actual amount properly allocable to Tenant, credit against Tenant's next accruing Rent obligations an amount equal to the actual cost and expense of any such audit or examination (including travel and related expenses) to the extent incurred by Tenant for such review. Any audit conducted by Tenant with respect to any Additional Rent payable by Tenant under this Lease or any other payment obligation of Tenant under this Lease shall be performed only by a Certified Public Accountant licensed in the State of South Carolina and pursuant to a billing arrangement under which such Certified Public Accountant is not paid on a contingency fee basis. Nothing contained in this Section 23.26 gives rise to an audit right on the part of Tenant with respect to any Additional Rent or other payment obligation of Tenant under this Lease with respect to which: (i) this Lease provides that no audit right exists, or (ii) an audit is not allowed by applicable law.

## 23.27 - United States Dollars

All references in this Lease to "Dollars", "dollars" or any specific dollar amounts refer to in this Lease, shall be deemed to refer to United States dollars.

## 23.28 – Other Tenants; Future Exclusives

In addition to the Existing Exclusives, Landlord reserves the absolute right to affect other tenancies in the Shopping Center in the future as Landlord shall determine in the exercise of its sole business judgment and to grant to other tenants or occupants of the Shopping Center exclusive uses which do not conflict with Tenant's permitted use at the Premises as set forth in Section 1.03 of this Lease. Tenant shall observe and Tenant and this Lease shall be subject to such future exclusive uses. Notwithstanding anything to the contrary contained herein, Tenant does not rely on the fact, nor does Landlord represent, that any specific tenant or occupant, or the number of tenants or occupants, shall occupy any space in

4/5/19

the Shopping Center during the Term.  A vacation of premises or cessation of operations by any other tenant(s) in the Shopping Center shall not in any way release Tenant from its obligations under this Lease.

[END OF TEXT ON THIS PAGE, SIGNATURE PAGE TO FOLLOW]

4/5/19

**IN WITNESS WHEREOF**, the parties hereto have executed this Lease on the date first above written.

LANDLORD:

CPC OCEANFRONT DELAWARE, LLC,
    a Delaware limited liability company

By: _____

Name:

Title:   PATRICK MARINO

      MANAGER

TENANT:

EPIC ARCADES SC LLC,
A Delaware limited liability company

By: _____   4/5/19

Name: Richard Coleman

Title:   Principal & Senior Vice President of Development & Operations

4/5/19

(Acknowledgment of LANDLORD)

State of _____

                                               ss:

County of _____

On the _____ day of _____ in the year 20___ before me, the undersigned, a notary public in and for said state, personally appeared _____, personally known to me or proved to me on the basis of satisfactory evidence to be the individual whose name(s) is subscribed to the within instrument and acknowledged to me that he executed the same in his capacity, and that by his signature on the instrument, the individual or the person upon behalf of which the individual acted, executed the instrument.

_____
(Notary Public)

(Acknowledgment of TENANT)

State of _____

                                               ss:

County of _____

On the _____ day of _____ in the year 20___ before me, the undersigned, a notary public in and for said state, personally appeared _____, personally known to me or proved to me on the basis of satisfactory evidence to be the individual(s) whose name(s) is (are) subscribed to the within instrument and acknowledged to me that he/she/they executed the same in his/her/their capacity(ies), and that by his/her/their signature(s) on the instrument, the individual(s) or the person upon behalf of which the individual(s) acted, executed the instrument.

_____
(Notary Public)

33

4/5/19

## TABLE OF EXHIBITS

Exhibit A ............................................................................................................................ Site Plan

Exhibit B ........................................................................................ Description of Landlord's Work

Exhibit C ......................................................................................... Description of Tenant's Work

Exhibit D ....................................................................................................... Existing Exclusives

Exhibit E ............................................................................................................ Trash Receptacle

4/5/19

## EXHIBIT A
## SITE PLAN

4/5/19

## EXHIBIT B
## LANDLORD'S WORK

NONE – THE PREMISES ARE BEING DELIVERED IN AS-IS, WHERE-IS CONDITION

4/5/19

## EXHIBIT C
## TENANT'S WORK

Tenant accepts the Premises in its "as is" condition on the date that possession of the Premises is made available by Landlord, and shall, at its sole cost and expense, and in accordance with Tenant's Plans, furnish all labor, material, fixtures and equipment necessary to complete, in a good, substantial and approved manner, all work required to bring the Premises to a finished condition ready for the conduct of Tenant's business therein.

4/5/19

## EXHIBIT D
## EXISTING EXCLUSIVES

### TIN ROOF

As used herein, the term "Competing Use" shall mean a full service bar and restaurant with late night (past midnight) entertainment focusing on live entertainment and featuring full band setups and DJs. The term "Competing Tenant" shall mean any individual or entity that operates a Competing Use that is not: (1) Tenant or a Related Entity (as defined below), or (2) a licensee, concessionaire, franchisee, assignee or sublessee of Tenant or a Related Entity. The term "Related Entity" means Tenant and any parent, subsidiary or affiliate of Tenant (for purposes of this Section 1.04 only, an "affiliate" of Tenant shall mean an entity, twenty-five percent (25%) or more of which is owned or controlled by an individual or entity which owns or controls twenty-five percent (25%) or more of Tenant).

### BURGERFI

"Competing Use" for the purpose of this Section shall mean a restaurant where (a) more than twenty-five percent (25%) of a tenant's menu items are beef hamburgers, and/or (b) beef hamburgers constitute more than twenty-five percent (25%) of a tenant's gross sales over a three (3) full calendar month period, and/or (c) the sale of beef hamburgers is a general theme of such restaurant in terms of décor, trade name or public identification. Each condiment or topping on a hamburger or a combination of such condiments or toppings shall not be deemed to create a separate menu item. The term "Competing Tenant" shall mean an individual or entity that operates a Competing Use that is not (1) Tenant or Related Entity (as defined below), or (2) a licensee, concessionaire, franchisee, assignee or sublessee of Tenant or a Related Entity. The term "Related Entity" means Tenant and any parent, subsidiary or affiliate of Tenant (for purposes of this Section 1.04 only, an "affiliate" of Tenant shall mean an entity, twenty-five percent (25%) or more of which is owned or controlled by an individual or entity which owns or controls twenty-five (25%) or more of Tenant). Examples of a Competing Tenant includes, without limitation, Smashburger, Culvers, Red Robin, Wahlburgers, Habit, Hopdoddy, In 'N' Out, Sonic Drive-In, Five Guys, and Mooyah. Landlord agrees to enforce Tenant's rights under this Section against other businesses in the Shopping Center using all reasonable legal means. Landlord covenants that all leases in the Shopping Center signed after the Effective Date of this Lease shall require those tenants to honor Tenant's rights hereunder.

### GENERAL STORE

Provided that Tenant is not in default under this Lease beyond any applicable cure period and is open and operating in the entire Premises in accordance with Sections 1.03 and 6.02 hereof, Tenant shall have the exclusive right within the Shopping Center to sell swimwear, beach supplies, beach toys and beach towels (such items, hereinafter referred to as the "Protected Merchandise"). Nothing herein shall preclude another tenant, whether now existing or in the future, within the Shopping Center from selling branded and/or promotional merchandise, including, but not limited to, swimwear, beach supplies, beach toys and beach towels of such tenant.

### STARBUCKS

For the Term of this Lease and subject to the provisions of Sections 1.04(b)-(c) below, provided (i) this Lease is in full force and effect, and (ii) Tenant is not then in breach of any of the terms, covenants or conditions of this Lease required to be observed or performed by Tenant, and (iii) Tenant is open and operating in the Premises in accordance with Sections 1.03 and 6.02 of this Lease, Landlord covenants that Landlord has not and will not lease any premises in the Shopping Center to a restaurant (each, a "Breakfast Restaurant") which primarily serves breakfast menu items, such as eggs, omelets, pancakes and waffles (each, a "Breakfast Item," and collectively, "Breakfast Items"). Examples of a Breakfast Restaurants include Egg's Up Grill, Croissants Bistro & Bakery, Bakers Square Restaurant, Crepe Creation Cafe, Tupelo Honey, Biscuitville, and IHOP. Any restaurant at which thirty percent (30%) or more of the restaurant's menu items are Breakfast Items or the sale of Breakfast Items is a general theme of such restaurant in terms of marketing, décor, trade name or public identification is a Breakfast Restaurant. Restaurants that are not Breakfast Restaurants may operate from the Shopping Center; provided, however, such restaurants, may serve Breakfast Items only between the hours of 10:30 a.m. and 2:30 p.m. (Eastern Standard Time) (the "Limited Serving Hours") as a part of an event during the Limited Serving Hours presented to the public as a "Brunch" in which the Breakfast Items are a departure from its regular menu. For the avoidance of doubt, Landlord may lease premises within the Shopping Center to a tenant that operates a restaurant that is not a Breakfast Restaurant, but such tenant may only serve Breakfast Items as a part of an event during the Limited Serving Hours presented to the public as a "Brunch" in which the Breakfast Items are a departure from its regular menu.

## FIRST-CITIZENS BANK & TRUST COMPANY

Except as to those tenants listed on "**Exhibit C**," so long as this Lease is in effect and Tenant has not committed an Event of Default, Landlord shall not allow the placement of any other automated teller machine at or within the Real Property, nor shall Landlord lease or sublease any space in the Real Property (including any outparcels) to any other financial institution for the operation of an in-store branch bank.

## BANDITOS

Provided that Tenant is not in default under this Lease beyond any applicable cure period and is open and operating in the entire Premises in accordance with Sections 1.03 and 6.02 hereof, but with the exceptions of existing tenants as listed on Exhibit D attached hereto ("Existing Tenants"), Landlord agrees that it shall not lease any premises in the Shopping Center to a full-service restaurant that serves beer and liquor and that features Mexican Food, where "features" means that those food items comprise more than 50% of the menu offerings, and "full-service" means that the restaurant offers services to patrons, seated at a table, through servers/waiters; it is not intended to include restaurants where customers place their food order and receive their food at a walk-up counter ("Tenant's Exclusive Use").

4/5/19

**EXHIBIT E**
**Trash Receptacle**

4/5/19

## FIRST AMENDMENT TO SHOPPING CENTER LEASE

This First Amendment to Shopping Center Lease ("First Amendment") is made and entered into this 15th day of August 2019 (the "Effective Date") by and between CPC Oceanfront Delaware, LLC, a Delaware limited liability company ("Landlord") and Epic Arcades SC LLC, a Delaware limited liability company ("Tenant").

### RECITALS

WHEREAS, pursuant to that certain Shopping Center Lease dated on or about April 5, 2019 (the "Lease"), Landlord leased to Tenant those certain premises located at 1410 North Ocean Boulevard, Myrtle Beach, South Carolina as more particularly described in the Lease (the "Premises"); and

WHEREAS, Landlord and Tenant desire and intend by this First Amendment to modify and amend the Lease pursuant to the terms and conditions herein set forth.

NOW, THEREFORE, for good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties hereto agree as follows:

1.    <u>Recitals</u>.  The foregoing recitals are incorporated herein by this reference and made a part hereof as though set forth in full.

2.    <u>Defined Terms</u>.  All terms defined in the Lease shall have the same meaning when made herein, unless redefined herein.

3.    <u>Term Commencement Date</u>.  Notwithstanding anything contained in Section 2.01 of the Lease to the Contrary, the Term Commencement Date shall be the earlier of (i) the date Tenant first opens for business to the public and (ii) September 15, 2019.

4.    <u>Permit Contingency</u>.  Tenant hereby acknowledges that the Permit Contingency has been satisfied.  Consequently, Section 2.05 of the Lease is hereby deleted in its entirety.

5.    <u>Rent</u>.  Section 3.01(a) and Section 3.01(b) of the Lease shall be deleted in their entirety and replaced with the following:

(a)    Commencing on the Term Commencement Date, Tenant agrees to pay Landlord, without diminution, deduction or set-off whatsoever and without prior notice or demand, and as fixed annual minimum rent ("Fixed Annual Minimum Rent"), the sums set forth below payable in equal consecutive monthly installments ("Fixed Monthly Minimum Rent") each in advance upon the first day of each calendar month during the term hereof.

| LEASE YEAR | FIXED ANNUAL MINIMUM RENT | FIXED MONTHLY MINIMUM RENT | RENT PER SQUARE FOOT |
|---|---|---|---|
| 1 | $   350,000.00 | $    29,166.67* | $30.389 |
| 2 | $   357,000.00 | $    29,750.00 | $30.998 |



| | | | |
|---|---|---|---|
| 3 | $ 364,140.00 | $ 30,345.00 | $31.617 |
| 4 | $ 371,422.80 | $ 30,951.90 | $32.249 |
| 5 | $ 378,851.26 | $ 31,570.94 | $32.894 |
| 6 | $ 386,428.28 | $ 32,202.36 | $33.552 |
| 7 | $ 394,156.85 | $ 32,846.40 | $34.223 |
| 8 | $ 402,039.98 | $ 33,503.33 | $34.908 |
| 9 | $ 410,080.78 | $ 34,173.40 | $35.606 |
| 10 | $ 418,282.40 | $ 34,856.87 | $36.318 |
| **FIRST EXTENSION TERM** | | | |
| 11 | $ 426,648.05 | $ 35,554.00 | $37.045 |
| 12 | $ 435,181.01 | $ 36,265.08 | $37.785 |
| 13 | $ 443,884.63 | $ 36,990.39 | $38.541 |
| 14 | $ 452,762.32 | $ 37,730.19 | $39.312 |
| 15 | $ 461,817.57 | $ 38,484.80 | $40.098 |
| **SECOND EXTENSION TERM** | | | |
| 16 | $ 471,053.92 | $ 39,254.49 | $40.900 |
| 17 | $ 480,475.00 | $ 40,039.58 | $41.718 |
| 18 | $ 490,084.50 | $ 40,840.37 | $42.553 |
| 19 | $ 499,886.19 | $ 41,657.18 | $43.404 |
| 20 | $ 509,883.91 | $ 42,490.33 | $44.272 |

(b)    If the term shall commence upon a day other than the first day of a calendar month or if the term shall expire upon a day other than the last day of a calendar month, then Tenant shall pay, upon the Term Commencement Date, and on the first day of the last calendar month, a pro rata portion of the Fixed Monthly Minimum Rent for the first and last fractional calendar months of the term.

6.    <u>Binding Effect</u>.  This First Amendment shall be binding upon and inure to the benefit of the Landlord and Tenant and their respective successors and assigns.

7.    <u>Facsimile and Counterpart Signatures</u>.  This First Amendment may be executed in any number of counterparts, each of which shall be deemed an original, but all of which together shall be one in the same instrument.  For purposes of executing this First Amendment, any signed copy of this First Amendment may be transmitted by facsimile machine and the signature of any party hereon shall, for purposes of execution hereof, be considered an original signature.  Any facsimile of this First Amendment shall, at the request of either party, be re-executed by the other party in an original form, and neither party shall raise the use of a facsimile machine or the fact that any signature was transmitted thereby, as a defense to the effectiveness of this First Amendment.

8.    <u>Effect of this Amendment</u>.  Except as modified by this First Amendment, the Lease shall remain unchanged and in full force and effect.   In the event of any difference, conflict or discrepancy between the terms of the Lease and the terms of this First Amendment, the terms of this First Amendment shall govern and control.



[SIGNATURE PAGES FOLLOW]



IN WITNESS WHEREOF, the parties hereto have executed this First Amendment on the date first written hereinabove.

**LANDLORD**

CPC Oceanfront Delaware, LLC,
a Delaware limited liability company

By: _____

Name: Patrick T. Marino, its Manager

**TENANT**

EPIC ARCADES SC LLC,
A Delaware limited liability company

By:
Name:     Francis E. Pracukowski, Member

By:
Name:     Richard P. Coleman, Member

## ASSIGNMENT OF LEASES

This ASSIGNMENT OF LEASES (**"Assignment"**) is made and entered into as of the *24* day of September, 2019 by and between CPC OCEANFRONT DELAWARE, LLC, a Delaware limited liability company (**"Assignor"**) and  CHALPIN REALTY SC LLC, a South Carolina limited liability company (**"Assignee"**).

## R E C I T A L S:

A.      Assignor and 4531 DAVIS STREET, LLC, a New York limited liability company, as predecessor-in-interest to Assignee, entered into that certain Agreement of Sale and Purchase dated June 18, 2019, as amended (**"Agreement"**) with respect to the sale of the "Property" described therein.

B.      Assignor desires to assign and transfer to Assignee all of Assignor's right, title and interest in and to the Leases, as defined in the Agreement, and Assignee desires to accept such assignment and to assume and perform all of Assignor's covenants and obligations in and under the Leases from and after the date hereof.

NOW, THEREFORE, in consideration of the foregoing recitals and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, Assignor and Assignee hereby agree as follows:

1.      Assignor hereby assigns and transfers to Assignee all of Assignor's right, title and interest in and to the Leases.  A schedule of the Leases to be assumed by Assignee hereunder is attached hereto as **Schedule "1"**.

2.      Assignee hereby accepts the above assignment and expressly assumes and covenants to keep, perform, fulfill and discharge all of the terms, covenants, conditions and obligations required to be kept, performed, fulfilled and discharged by Assignor under the Leases from and after the date hereof.

3.      Assignor shall indemnify, defend and hold harmless Assignee from and against any and all obligations, claims, damages, losses, costs or expenses, including, without limitation, reasonable attorneys' fees and court costs, arising in connection with any failure by Assignor to fulfill Assignor's obligations under the Leases or other liability under the Leases accruing prior to the date hereof.  Assignee shall indemnify, defend and hold harmless Assignor from and against any and all obligations, claims, damages, losses, costs or expenses, including, without limitation, reasonable attorneys' fees and court costs, arising in connection with any failure by Assignee to fulfill Assignee's obligations under the Leases or other liability under the Leases accruing on or after the date hereof.

4.      This Assignment shall be governed by and construed in accordance with the laws of the State of South Carolina (without reference to choice of laws principles thereof).

5.      This Assignment may be executed in one or more counterparts.  All such counterparts, when taken together, shall comprise the fully executed Assignment.  This Assignment may also be executed by delivery by facsimile or electronic mail of an executed counterpart of this Assignment.  The parties hereto agree that the signature of any party transmitted by facsimile with confirmation of transmission or by electronic mail shall have binding effect as though such signature were delivered as an original.

**THE REMAINDER OF THIS PAGE IS INTENTIONALLY LEFT BLANK-SIGNATURE PAGE FOLLOWS**

IN WITNESS WHEREOF, Assignor and Assignee have duly executed this ASSIGNMENT OF LEASES as of the day and year first above written.

"ASSIGNOR"                                          "ASSIGNEE"

**CPC OCEANFRONT DELAWARE, LLC,**          **CHALPIN REALTY SC LLC,**
**a Delaware limited liability company**          **a South Carolina limited liability company**

By: _____        By: _____
Name: Patrick T. Marino                              Name: _____
Its: Manager                                            Its: _____

IN WITNESS WHEREOF, Assignor and Assignee have duly executed this ASSIGNMENT OF LEASES as of the day and year first above written.

"ASSIGNOR"                                    "ASSIGNEE"

**CPC OCEANFRONT DELAWARE, LLC,**            **CHALPIN REALTY SC LLC,**
**a Delaware limited liability company**       **a South Carolina limited liability company**

By: _____          By: _____
Name:  Patrick T. Marino                       Name:  MARC CHALPIN
Its:  Manager                                  Its:  Co - Manager

## SCHEDULE "1"

### (List of Leases Assigned to Buyer)

1.    ATM Lease Agreement dated April 23, 2019, as amended ("ATM Lease"), entered into with FIRST-CITIZENS BANK & TRUST COMPANY, a North Carolina banking corporation, as tenant, for certain premises at 1410 North Ocean Boulevard, Myrtle Beach, South Carolina 29577, as more particularly described in the ATM Lease.

2.    Shopping Center Lease dated May 29, 2018, as amended ("Bandito's Lease"), entered into with MB OCEANFRONT ENTERTAINMENT, LLC, a Florida limited liability company, d/b/a Bandito's Restaurant and Cantina on the Boardwalk, as tenant, for certain premises at 1410 North Ocean Boulevard, Myrtle Beach, South Carolina 29577, as more particularly described in the Bandito's Lease.

3.    Commercial Lease dated August 23, 2017, as amended ("BurgerFi Lease"), entered into with BURGERFI ENTERPRISES, LLC, a Florida limited liability company, as predecessor in interest to BGR FICATION NORTH MYRTLE BEACH, LLC, a North Carolina limited liability company, as tenant, for certain premises at 1410 North Ocean Boulevard, Myrtle Beach, South Carolina 29577, as more particularly described in the BurgerFi Lease.

4.    Commercial Lease dated April 19, 2018, as amended ("Starbucks Lease"), entered into with MB NATIONAL, LLC, a South Carolina limited liability company, d/b/a Starbucks, as tenant, for certain premises at 1410 North Ocean Boulevard, Myrtle Beach, South Carolina 29577, as more particularly described in the Starbucks Lease.

5.    Commercial Lease dated March 6, 2017, as amended ("Tin Roof Lease"), entered into with TIN ROOF ACQUISITION COMPANY, LLC, d/b/a Tin Roof, as tenant, for certain premises at 1410 North Ocean Boulevard, Myrtle Beach, South Carolina 29577, as more particularly described in the Tin Roof Lease.

6.    Shopping Center Lease dated May  16, 2017, as amended ("ANI Creation Lease"), entered into with ANI CREATION, LLC, as tenant, for certain premises at 1410 North Ocean Boulevard, Myrtle Beach, South Carolina 29577, as more particularly described in the ANI Creation Lease.

7.    Commercial Lease dated on or about April 5, 2019, as amended ("Arcade Lease"), entered into with EPIC ARCADES SC, LLC, a Delaware limited liability company, as tenant, for certain premises at 1410 North Ocean Boulevard, Myrtle Beach, South Carolina 29577, as more particularly described in the Arcade Lease.