**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF SOUTH CAROLINA**
**FLORENCE DIVISION**

| | | |
|---|---|---|
| CHALPIN REALTY SC, LLC, | ) | Civil Action No: 4:22-cv-02651-JD |
| | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | **JERSAM REALTY, INC.'S MOTION** |
| vs. | ) | **TO ALTER OR AMEND AND** |
| | ) | **INCORPORATED MEMORANDUM** |
| JERSAM REALTY, INC., | ) | **IN SUPPORT** |
| | ) | |
| Defendant. | ) | |

**PLEASE TAKE NOTICE** that Counterclaimant/Defendant, Jersam Realty, Inc. ("Jersam" or "Buyer"), by and through its undersigned counsel, moves this Court pursuant to Fed. R. Civ. P. 52(b) and 59(e) to correct factual and legal errors contained in the Court's Order (DE 31).

As discussed herein, there are two primary grounds for this Motion: (1) the Court's finding that there was no breach of the underlying Lease by Epic Arcades SC, LLC ("Tenant Arcade") is contrary to language of the underlying Lease and Plaintiff's acknowledgment that Tenant Arcade was in breach of its Lease; and (2) the Court's construction of the Contract fails to give effect and meaning to the language used by the parties in the Contract. Accordingly, Jersam requests that the Court alter and amend its Order (DE 31) to correct these legal and factual errors and to grant Jersam summary judgment on its Counterclaims, award the relief sought therein, and deny Plaintiff's Motion for Summary Judgment (DE 16) and subsequent motions relating to interest and attorney's fees (DE 35, 36).

**PROCEDURAL HISTORY AND BACKGROUND**

This case arises out of alleged breaches of a real estate contract ("Contract") for the sale of a multi-tenant shopping center located at 1410 North Ocean Boulevard, Myrtle Beach, South Carolina ("Property"). Chalpin Realty SC, LLC ("Plaintiff" or "Seller") filed this action, and Defendant

counterclaimed, with both parties asserting causes of action for breach of contract and declaratory judgment. Pursuant to the Consent Scheduling Order, the parties agreed that "no discovery is being requested or believed to be necessary in this action" and "the action should be decided as a consequence of motions for summary judgment pursuant to Fed. R. Civ. P. 56." (DE 15.) The parties filed cross motions for summary judgment (DE 16, 17), which were heard on September 1, 2023. On September 26, 2023, the Court granted Plaintiff's Motion for Summary Judgment and denied Defendant's Motion for Summary Judgement. (DE 31.)

## STANDARD OF REVIEW

Fed. R. Civ. P. 52(b) provides that "on a party's motion filed no later than 28 days after entry of judgment, the court may amend its findings—or make additional findings—and may amend the judgment accordingly." Fed. R. Civ. P. 52(b). "The primary purpose of Rule 52(b) is to ensure that the trial court's findings of fact and legal reasoning are clear." *Alcala v. Hernandez*, No. 4:14-CV-04176-RBH, 2015 WL 7312891, at *1 (D.S.C. Nov. 19, 2015). "Motions to amend under Rule 52(b), FRCP, are raised to 'challenge some of the court's findings of fact and omissions.'" *Progressive Church of Our Lord Jesus Christ, Inc. v. Progressive Church of Our Lord Jesus Christ-Tallahassee, Inc.*, No. 3:19-CV-03541, 2021 WL 2418493, at *1 (D.S.C. June 14, 2021) (quoting *Goodwin v. Cockrell*, No. 4:13-CV-199-F, 2015 WL 12851581, at *1 (E.D.N.C. Dec. 30, 2015). "Thus, to succeed under Rule 52(b), the defendants must show that the Court's findings of fact or conclusions of law are not supported by the evidence in the record." *Butts v. United States*, No. 3:16-CV-53, 2018 WL 5078440, at *1 (N.D.W. Va. Apr. 23, 2018).

The Fourth Circuit has interpreted Fed. R. Civ. P. 59(e), to allow the court to alter or amend an earlier judgment "to correct a clear error of law or prevent manifest injustice." *Becker v. Westinghouse Savannah River Co.*, 305 F.3d 284, 290 (4th Cir. 2002). Accordingly, "the rule permits a district court to correct its own errors, sparing the parties and the appellate courts the burden of

unnecessary appellate proceedings." *Pac. Ins. Co. v. Am. Nat. Fire Ins. Co.*, 148 F.3d 396, 403 (4th Cir. 1998) (quoting *Russell v. Delco Remy Div. of Gen. Motors Corp.*, 51 F.3d 746, 749 (7th Cir. 1995)). A party moving pursuant to Rule 59 must demonstrate more than "mere disagreement" with the court's order to succeed on a Rule 59(e) motion. *Hutchinson v. Staton*, 994 F.2d 1076, 1082 (4th Cir. 1993). The decision whether to reconsider an order resulting in judgment is within the discretion of the district court. *Hughes v. Bedsole*, 48 F.3d 1376, 1382 (4th Cir. 1995).

## ARGUMENT

The Property was marketed as a multi-tenant shopping center, with the Property to be sold along with the tenants and leases in place such that the existing leases would be assigned to Buyer at closing. The Contract was dated May 13, 2022. (DE 1-1.) Following an amendment, the Contract contemplated a due diligence period through June 3, 2022. On June 3, 2022, the Contract was terminated by Buyer and reinstated on June 7, 2022 with a closing date to occur on June 17, 2022. (DE 18-7, 18-9, 18-10.)

In situations like this where there is a gap between the time of contracting and the time of closing, the purpose of a bring down provision is well established and understood. In essence, a bring down provision protects a buyer from the seller's "business changing or additional, unforeseen risks arising before closing" such that a buyer is not required to purchase something different than what they originally contracted to purchase. Lou R. Kling et. al., *Summary of Acquisition Agreements*, 51 U. Miami L. Rev. 779, 799 (1997). In other words, this type of provision prevents the Seller from committing a "bait and switch" between the time of the contract and the ultimate closing date.

Specifically, a "bring-down provision" is defined as "[a] contractual covenant that all of a party's representations and warranties were true when the contract was executed and will be true on the closing date." Bring-down Provision, Black's Law Dictionary (11th ed. 2019). "[I]t is common practice that the seller confirms to the buyer that the declarations, warranties and guarantees given in

the reps and warranties section will be equally true and valid without any modifications as of the closing date; **this conformation is made either directly in the framework contract** or in a separate document, the so-called 'Bring Down Certificate.'" Theobald, Hans-Ulrich, M&A Vocabulary – Experts Explain Bring Down Certificate (December 21, 2022), https://www.roedl.com/insights/ma-dialog/2022-12/ma-vocabulary-experts-explain-bring-down-certificate. (last visited October 24, 2023) (emphasis added).

Here, the bring down provision was included in the Contract. (DE 1-1, p. 11 of 62) ("[t]he representations and warranties of Seller set forth in this Section 4 are made as of the date of this Contract **and are and shall be restated as of the Closing Date.**") (emphasis added). Case law confirms that a bring down provision does not require a separate bring down certificate. *See e.g., W. Filter Corp. v. Argan, Inc.*, 540 F.3d 947, 952 (9th Cir. 2008) (analyzing a bring down provision, which did not require a bring down certificate: "The representations and warranties of [Argan] under this Agreement shall be true and correct in all material respects as of the date of the Closing with the same effect as though made on and as of the date of the Closing"); *see also AB Stable VIII LLC v. Maps Hotels & Resorts One LLC*, No. CV 2020-0310-JTL, 2020 WL 7024929, at *51 (Del. Ch. Nov. 30, 2020), *judgment entered,* (Del. Ch. 2021), and *aff'd,* 268 A.3d 198 (Del. 2021) ("Seller did not

have to take any action to satisfy the Bring-Down Condition, and the baseline expectation was for Seller's representations to be accurate.").[1]

"'[R]epresentations and warranties are statements of fact as of the date of the execution of the acquisition agreement, and the truthfulness of the representations and warranties as of both the date of execution and [] the date of the closing is generally a condition to the closing.'" *W. Filter Corp. v. Argan, Inc.*, 540 F.3d 947, 952 (9th Cir. 2008) (quoting Samuel C. Thompson, Jr., *Business Planning for Mergers and Acquisitions* 780 (Carolina Academic Press 2001) (1997). "In other words, the representations and warranties serve as a safety net for the seller and buyer." *Id.* "If, prior to closing, either the seller or buyer discovers that a representation or warranty made by the other party is not true, they have grounds for backing out of the deal." *Id.* "The condition that the other party's representations and warranties be true and correct at closing is generally the most significant condition for both buyers and sellers." Lou R. Kling et. al., *Summary of Acquisition Agreements*, 51 U. Miami L. Rev. 779, 799 (1997). "This 'bringdown' clause protects each party from the other's business changing or additional, unforeseen risks arising before closing." *Id.* "The reps & warranties, when combined with the bring-down condition, serve an important risk allocation purpose." *Akorn,*

---

[1] A bring down provision allows the buyer to avoid closing if the representations and warranties made in the contract are no longer true at closing. *W. Filter Corp. v. Argan, Inc.*, 540 F.3d 947, 952 (9th Cir. 2008) (noting that a bring down provision without a survival clause or bring down certificate means the breaching party cannot be sued for damages post-closing for their later discovered breach). In contrast, a bring down certificate, is utilized as "a way around the doctrine of merger in the sense that it permits the representations and warranties to survive after closing" such that after closing, "the purchaser will have the ability to sue the seller of the business should any of the reps and warranties later turn out to be untrue" Shira Kalfa, J.D., Bring-Down Certificate (2020), https://kalfalaw.com/bring-down-certificate-of-representations-and-warranties/ (last visited October 24, 2023) ("the doctrine of merger states that all prior negotiations, statements and agreements – including the purchase agreement – are deemed merged on the closing when the purchase agreement comes to an end," which "means from the date of closing, these important reps and warranties that induced the purchaser to enter into the agreement and buy the business will no longer be binding on the seller"; a bring down certificate "survives for several years after closing"); s*ee also* 9/1/2023 Trans., p. 27:10-19, attached as Exhibit A (Seller's counsel discussing a bring down certificate and how "everything is going to merge into the final closing papers").

*Inc. v. Fresenius Kabi AG*, No. CV 2018-0300-JTL, 2018 WL 4719347, at *78, FN 761 (Del. Ch. Oct. 1, 2018), *aff'd*, 198 A.3d 724 (Del. 2018) (internal citations omitted). "In effect, they provide downside protection on specific aspects of the deal." *Id.* "If those aspects are not true at the closing, the buyer has the right to walk away." *Id.* "This can include events that are outside the seller's control." *Id.* "[W]here the representations and warranties expire at closing . . . it being understood that the contractual representations and warranties will be true as of the closing date and can provide a basis to avoid closing." *GRT, Inc. v. Marathon GTF Tech., Ltd.*, No. CIV.A. 5571-CS, 2011 WL 2682898, at *13 (Del. Ch. July 11, 2011).

In Section 4 of the Contract, entitled "Representations of Seller," Seller "represent[ed] and covenant[ed]" to Buyer regarding the leases. (DE 1-1.) In Section 4.02(k) of the Contract, Plaintiff represented that "to Seller's actual knowledge, no tenant who is in actual possession as of the Effective Date under any Lease is in breach of any of its obligations under said Lease, and there exists no conditions which, with the giving of notice or the passage of time would constitute a breach by any tenant of its obligations under any Lease." (DE 1-1, p. 9 of 62.) Seller further represented in Section 4.02(b) that "all of the Leases are in full force and effect." (*Id.* at 8.) However, contrary to Seller's representations and warranties, Tenant Arcade breached its obligations under its Lease. Accordingly, Seller's representations and warranties contained the Contract were not and could not be restated "as of the closing date." Given this basic and undisputed fact, the Court's Order erred (1) in stating "the record does not support a finding that Tenant Arcade's lease was not in full force and effect or had breached its obligations"; and (2) in effectively writing Sections 4.02(b) and (k) and the corresponding bring down provision out of the Contract. (DE 31, pp. 10-11.)

**I. The Court's finding that there was no breach of the underlying Lease by Tenant Arcade is contrary to language of the underlying Lease and Plaintiff's acknowledgment that Tenant Arcade was in breach of its Lease.**

In its Order, the Court found that "the record does not support a finding that Tenant Arcade . . . had breached its obligations," while acknowledging that the record "shows [Tenant Arcade] was terminating its operations." (DE 31, p. 10.)  If Tenant Arcade had not breached its obligations under its Lease, as the Court found, then Seller's representation and warranties contained in Section 4.02(k) of the Contract concerning breaches could have been restated as of the closing date, and this action would not be before the Court.

The record, however, establishes that Tenant Arcade breached its obligations under its Lease. Section 6.02 of Tenant Arcade's Lease contained "Tenant's Operating Covenant," which states:

### 6.02 - Tenant's Operating Covenant

Tenant shall occupy the Premises on and after the Term Commencement Date and shall continuously operate its store in the entire Premises during the full term of this Lease.  Tenant shall operate the Premises in a manner consistent with the majority of the other stores operated by Tenant as of the date hereof under the same trade name and having the same or similar use as the use as provided for in this Lease.  Tenant shall use for office, storage, or other non-selling purposes only such space as is reasonably required for the proper operation of Tenant's retail business in the Premises.  Except for national holidays, Tenant shall conduct its business in the Premises seven (7) days per week, except for the Roof Deck, which may but not necessarily shall be open from November 1 – March 31 yearly and which may close in the event of inclement weather any time of year.  Tenant acknowledges and agrees that the Shopping Center's success is dependent upon the continued operation of Tenant's business, and that the maintenance of the character and quality of the Shopping Center is enhanced by the continued occupancy of the Premises and the regular conduct of Tenant's business as required herein.

(DE 18-8, p. 18.)  Tenant Arcade was required to "continuously operate its store in the entire Premises during the full term of this Lease," which Lease term was for ten-years beginning in 2019.[2]  Article 15.01 of Tenant Arcade's Lease identified "events of default," and one such event of default, Article 15.01(vii), concerns Tenant Arcade's covenant to continuously operate. (*Id.* at 27). Specifically, Article 15.01(vii) states, "[i]f at any time prior to or during the term of any one or more of the following events occurs, each such event shall constitute an 'event of default': (vii) Tenant ceases

---

[2] Tenant Arcade's Lease had a ten-year lease term beginning in 2019. (DE 18-8, Article 2.02.)

operation in or vacates or abandons the Premises or otherwise fails to fully perform the obligations contained in Sections 6.01 and 6.02 of this Lease." (*Id.*)

Plaintiff has acknowledged there were breaches of the underlying Lease and that Plaintiff was unable to restate the representations and warranties contained in Section 4 of the Contract as of the closing date. On June 14, 2022, Plaintiff's counsel stated that "my client can no longer restate the representations of Section 4.02 as it pertains to the Arcade as they have failed to pay June, 2022 Rent or Additional Rent and now appear to be abandoning/surrendering the premises." (DE 18-13 and 7-1). It is undisputed that on June 14, 2022, Plaintiff was informed by its property manager that Tenant Arcade's "moving crew arrived last night," and that Tenant Arcade was "moving everything out" for "truck pickup." (*Id.*) As referenced in the record, Seller's property manager also attached several pictures to his email supporting his statements. (*Id.*) That email was forwarded to Buyer. (*Id.*) Additionally, prior to closing, Seller realized that it could not restate the provision regarding the leases and attempted to modify the representations and warranties made in Section 4.02(b) and (k) of the Contract as follows:

> Seller hereby affirms that such Seller's representations and warranties as set forth in the Contract of Sale and Agreement remain true and correct in all material respects on the date hereof **except that Epic Arcades SC LLC has not paid Rent or Additional Rent for June, 2022 and, upon information and belief, is surrendering and abandoning the Premises as of June 14, 2022.**

(DE 21-1) (emphasis added). Thus, Seller acknowledged Tenant Arcade was surrendering and abandoning the Premises, which was a breach of Tenant Arcade's covenant to continuously operate and a breach of the Lease.

Upon learning of Tenant Arcade's breach, Buyer requested that Seller "let us know as soon as possible if Seller will be able to effect a cure of the Tenant Breach and proceed towards Closing." (DE 7-2.) It is undisputed that Seller was unable to effect a cure of Tenant Arcade's breach as Tenant Arcade never resumed operations at the premises prior to the closing, which was the cure deadline specified in

Section 13.04 of Contract.[3] (DE 1-1, p. 24 of 62.) Although the Court acknowledged that the evidence "shows [Tenant Arcade] was terminating its operations," the Court erred in its finding that this was not a breach of Tenant Arcade's underlying Lease.

Additionally, Tenant Arcade's Lease required that Tenant Arcade pay rent on the "first day of each calendar month." (DE 18-8, p. 13 of 58.) It is undisputed that as of the June 17, 2022 closing date, Tenant Arcade had not paid June rent. Failure to pay rent is also an event of default under Article 15.01(x) of Tenant Arcade's Lease. (*Id.* at 27 of 58.)[4] It is undisputed that Seller was unable to effect a cure of Tenant Arcade's failure to pay rent before the closing date.

Based on the foregoing, the Court should amend its finding that "the record does not support a finding that Tenant Arcade . . . had breached its obligations" (DE 31, p. 10) and find that Tenant Arcade had breached its obligations under the Lease by terminating operations in the premises and

---

[3] Plaintiff's pleadings also confirm that Tenant Arcade "abandoned the premises." (DE 1, ¶ 56, asserting "Section 4.02 does not provide the Defendant with a contractual right of cancellation because a tenant did not pay rent or abandoned the premises."). Additionally, in an affirmative defense to Buyer's Counterclaims, Plaintiff asserted "Defendant assumed the risk that Tenant Arcade may cease operations." (DE 12, ¶ 158); 1A C.J.S. Actions § 93 (2023) ("An affirmative defense is an assertion of facts or law by the defendant that avoids the action and defeats liability even if the plaintiff's cause of action is established or admitted."). Thus, Plaintiff also acknowledged in its pleadings that Tenant Arcade had "abandoned the premises" and "cease[d] operations." This fact was undisputed, which is why the parties agreed to forego discovery in this matter.

[4] Section 9.05 of the Contract required Plaintiff to "promptly give written notice to Purchaser of the occurrence of any event when known to Seller affects the truth or accuracy of any representations or warranties made or to be made by Seller under or pursuant to this Contract or amounts to any material change in any condition with respect to the Premises." (DE 1-1, p. 17 of 62.) Plaintiff failed to comply with this provision by waiting 13 days to notify Buyer that Tenant Arcade had failed to pay its June rent, which was due on June 1, 2022. At the time of Tenant Arcade's failure to pay rent and in the days following, due diligence had not yet expired. Had Seller timely notified Buyer of Tenant Arcade's breach before the end of the due diligence period, Buyer would have had the ability to terminate the Contract. Conveniently, Seller elected to wait until after due diligence expired and after the Contract was reinstated before notifying Buyer of Tenant's failure to pay rent and its inability to restate the representation and warranties as of the closing date. Seller's counsel acknowledged at the hearing on the motions that "the purchaser/defendant could have cancelled for any reason or no reason whatsoever during the due diligence period." (Exh. A, 9/1/2023 Trans., p. 18:16-19.)

failing to pay rent, which breaches were not cured as of the closing date.    Tenant's  breaches  were

and are undisputed by the parties, which is why the parties agreed to forego discovery in this matter.

**II. The Court's construction of the Contract fails to give effect and meaning to the language used by the parties in the Contract.**

Pursuant to Section 20.03, the subject Contract is "governed by, and construed in accordance

with, the law of the State of South Carolina." (DE 1-1, p. 29 of 62.)  It is a "cardinal principle of

contract construction that a document should be read to give effect to all its provisions."  *CoreTel*

*Virginia, LLC v. Verizon Virginia, LLC*, 752 F.3d 364, 370 (4th Cir. 2014).  Under South Carolina

law, "[o]ne part of the contract should not be interpreted so as to annul another provision of the same

contract." *Richland-Lexington Airport Dist. v. Am. Airlines, Inc.*, 306 F. Supp. 2d 548, 564 (D.S.C.

2002), *aff'd*, 61 F. App'x 67 (4th Cir. 2003).  "Presumably, all portions of a contract are inserted for

a purpose and the contract must be read as a whole, giving appropriate weight to all provisions."

*Herrington v. SSC Seneca Operating Co., LLC*, 435 S.C. 243, 248, 866 S.E.2d 579, 581 (Ct. App.

2021), *reh'g denied* (Jan. 11, 2022), *cert. granted* (Sept. 8, 2022). (rejecting a construction that "pits

the agreement against itself" and rendered a provision "essentially void of any practical effect").

"[A]n interpretation that gives meaning to all parts of the contract is preferable to one which renders

provisions in the contract meaningless or superfluous." *Stevens Aviation, Inc. v. DynCorp Int'l LLC*,

407 S.C. 407, 417, 756 S.E.2d 148, 153 (2014); *see also, Dermatology Assocs. of San Antonio v.*

*Oliver St. Dermatology Mgmt. LLC*, No. CV 2017-0665-KSJM, 2020 WL 4581674, at *29 (Del. Ch.

Aug. 10, 2020) (rejecting interpretation of a bring-down provision that rendered the "as of the closing

date" language a "nullity," because the "law rejects interpretations of contracts that render provisions

null and void.").  "It is fundamental that, in the construction of the language of a contract, it is proper

to read together the different provisions therein dealing with the same subject matter, and where

possible, all the language used should be given a reasonable meaning." *Mears Grp., Inc. v. Kiawah*

*Island Util., Inc.*, 372 F. Supp. 3d 363, 373 (D.S.C. 2019) (quoting *Bluffton Towne Ctr., LLC v.*

*Gilleland-Prince*, 412 S.C. 554, 569, 772 S.E.2d 882, 890 (Ct. App. 2015)).  "When the terms of a contract are in conflict, contemporary interpretations of the contract by the parties are determinative." *Richland-Lexington Airport Dist. v. Am. Airlines, Inc.*, 306 F. Supp. 2d 548, 565 (D.S.C. 2002), *aff'd*, 61 F. App'x 67 (4th Cir. 2003) (citing *Kitchens v. Lee*, 221 S.C. 59, 69 S.E.2d 67 (1952)).

Here the Court's construction of the Contract renders the representation and warranties and the bring down provision contained in Section 4 of the Contract meaningless and "undermines the well-understood function of that condition, which is to protect each party from the other's business changing or additional, unforeseen risks arising prior to closing." *Dermatology Assocs.*, 2020 WL 4581674, at *29 (Del. Ch. Aug. 10, 2020).  The Court's Order further fails to consider the implications of Section 9.05, which provides "Seller shall promptly give written notice to Purchaser of the occurrence of any event when known to Seller affects the truth or accuracy of any representations or warranties made or to be made by Seller under or pursuant to this Contract or amounts to any materials change in any condition with respect to the Premises." (DE 1-1.)  If there was not an obligation to restate as of closing, why would this provision be included?

In Section 4.02(k) of the Contract, Plaintiff represented that no tenant is in breach of any of its obligations under its Lease. (DE 1-1, p. 9 of 62.) The last sentence of Section 4 states, "the representations and warranties of Seller set forth in this Section 4 are made as of the date of this Contract and are and shall be restated as of the Closing Date." (*Id.* at 11 of 62.) As discussed above, Tenant Arcade breached its Lease obligations prior to closing by failing to pay rent, terminating its operations, and abandoning the premises. As such and as acknowledged by Seller in attempting to modify this clause, Seller's representations and warranties concerning tenant breaches could not be restated as of the Closing date.

It is true that Seller's representations contained in Section 4.02(b)-(1) of Contract are preceded by "except as set forth in the Rent Schedule or as otherwise provided in this Contract."[5] (DE 1-1 at 8 of 62.) However, the Court erred when it determined that other provisions of the contract and form exhibits superseded and rendered meaningless the representations and warranties found in Sections 4.02(b) and (k) and the corresponding bring down provision.  In its Order, the Court cites to Section 12.02, which deals with who is entitled to rent payments before and after closing.  Buyer agreed that Seller was entitled to rent payments for rent that accrued prior to the closing, and Seller agreed that Buyer was entitled to rent payments that accrued after the closing. While Section 12.02 discusses the timing of who gets what if rent is in arrears, it contains no language contrary to Seller's representations and warranties in Section 4.02(k) that no tenants were in breach of their lease obligations and contains no language relieving Seller of its obligation to restate the representations and warranties as of the closing date.  Issues relating to "rents and fees set forth are being attempted to be collected on a current basis and any arrearages with respect to same are as set forth on the Rent Schedule" are covered in Section 4.02(f) and are independent of the representations and warranties required under Sections 4.02(k) and (b).  (DE 1-1.) Section 4 addresses Seller's representations and warranties, and Section 12.02 addresses who is entitled to rents payments before and after closing. These Sections can and should be read in harmony, giving both provisions meaning, without one provision superseding the other.

While the representations, warranties, and the bring down provision in Section 4 can and should be read in harmony with Section 12.02, with both provisions given meaning, the Court erred when it construed Section 12.02 as being in conflict with and superseding Section 4 such that "Chalpin-Seller has no duty to restate Section 4.02(k) for Tenant Arcade's failure to pay rent in June."

---

[5] Importantly, the language of Section 4 states, "except as set forth in the Rent Schedule or as otherwise provided in this Contract," it does not say except as set forth in the form exhibits, which were to be executed at some point in the future if closing occurred.  (DE 1-1 at 8 of 62.)

(DE 31, p. 10).  Under South Carolina law, "[o]ne part of the contract should not be interpreted so as to annul another provision of the same contract." *Am. Airlines, Inc.*, 306 F. Supp. 2d at 564. This is precisely what the Court did here when it found that Section 12.02 prevailed over and rendered meaningless the representations and warranties and the bring down provision of Section 4.  Moreover, Section 12.02 in no way addresses the second breach discussed above—the failure to "continuously operate its store in the entire Premises during the full term of this Lease."

The Court also erred when it found "the Contract otherwise provides for tenant abandonment of the Property, so Chalpin Seller had no duty to restate" its representations and warranties at closing. (DE 31, p. 10.) First, other than the representations and warranties of Seller contained in Section 4 concerning tenant breaches, the Contract does not address a tenant terminating operations and abandoning the premises in breach and default of the tenant's lease after the Contract was executed and prior to the closing date.  Instead, the Court points to one contractual provision as being in conflict with and superseding Section 4 (Section 5.01(b)(v)) and two unsigned, undated form exhibits that were to be delivered at closing (Exhibit 10.01(b), and Exhibit 10.01(n)) to support it finding that "the Contract otherwise provides for tenant abandonment of the Property." (DE 31, pp. 10-11.)

In reaching this conclusion, the Court relied on language from the Assignment and Assumption of Leases Form, which is an unsigned and undated form document attached as an exhibit

to the Contract, which Plaintiff and Buyer were to execute and deliver "at the Closing."[6] (DE 1-1, Contract, Sections 10 and 11.) The Court relied on the language in Exhibit 10.01(b), which states, "[e]xcept as expressly set forth herein, this Assignment and Assumption of Lease is made without any covenant, warranty, or representation by, or recourse against Assignor, of any kind whatsoever." (DE 31, p. 10, FN 8; DE 1-1, p. 54 of 62). In other words, if the closing went forward, which it did not, Seller was making no further representations and warranties at the time it assigned the leases to Buyer.[7] However, the closing did not occur because Seller could not restate the representations and warranties contained in Section 4.02(k) of the Contract or cure Tenant Arcade's breach prior to the closing date.  As such, Seller did not assign any of its leases, and Buyer did not take any assignment of the leases.

Similarly, the Court erred in holding that Exhibit 10.01(n) supersedes Section 4.02. Exhibit 10.01(n) is a Tenant Estoppel Certificate Form document that Seller was required to deliver "at the closing." (DE 1-1, p. 19 of 62.) As discussed above, the closing did not occur because Seller could not restate its representation and warranties contained in Section 4.02 of the Contract "as of the closing date" because Tenant Arcade had breached it Lease by failing to pay rent, terminating its

---

[6] Exhibits 10.01(b) and 10.01(n) are not "schedules" to the Contract.  The schedules are listed in the Table of Contents of the Contract, and pursuant to Section 20.08 of the Contract, any schedules not listed in the Contract's Table of Contents are contained in Schedule D. (DE 1-1, p. 29 of 62). Unlike exhibits, schedules "are considered to be a substantive part of the definitive agreement itself."  J. Gerard Legagneur, J.D., How to Effectively Use Schedules, Exhibits, and Addendums in Your Contracts,     https://www.nolo.com/legal-encyclopedia/how-to-effectively-use-schedules-exhibits-and-addendums-in-your-contracts.html (last visited October 23, 2023). **"**Exhibits are not considered to be part of the definitive agreement" and "are typically viewed as samples (also known as specimens) of documents that the parties intend to either execute or deliver at some point in the future." *Id.*  Importantly, the language of Section 4 states, "except as set forth in the Rent Schedule or as otherwise provided in this Contract," it does not say except as set forth in the form exhibits, which are to be executed at some point in the future if closing occurs.  (DE 1-1, p. 8 of 62.)

[7] As discussed in footnote 1, *supra,* a bring down provision allows a buyer to walk away from the deal before closing; however, for the representations and warranties to survive the closing and avoid the merger doctrine, a bring down certificate or survival clause would be needed.

operations, and abandoning the premises.  Seller could not have delivered Tenant Arcade's May 18, 2022 Estoppel Certificate (DE 18-8) "at the closing" because the representations there were no longer true as of the time of closing.  Seller could not have delivered a knowingly false Estoppel Certificate without breaching the Contract's implied covenant of good faith and fair dealing.  *Tharpe v. G. E. Moore Co.*, 254 S.C. 196, 201, 174 S.E.2d 397, 399 (1970) ("There exists in every contract an implied covenant of good faith and fair dealing."); *see also DBSI Signature Place, LLC v. BL Greensboro, L.P.*, No. CV 05-051-SLMB, 2006 WL 1275394, at *12 (D. Idaho May 9, 2006) (finding that a party's delivery of an estoppel certificate as required by the Contract, if coupled with a knowledge that the information contained in the certificate was misleading or false, could rise to the level of a breach of the duty of good faith and fair dealing).

In addition, the Court also improperly construed Section 5.01(b)(v) of the contract to absolve Seller of its duty to restate under Section 4, which states:

> (b)    Purchaser acknowledges that, except as otherwise expressly provided herein, Seller has no obligation to alter, restore or repair the Premises in any manner whatsoever.  Seller's only obligation with respect to the condition of the Premises shall be to deliver the Premises as herein provided.  Except as expressly provided in this Contract, Seller has not made and does not make any representation, warranty, guaranty or statement as to (i) the physical (including, without limitation, environmental) condition, state of title, income, expenses, real estate and other taxes, operation or other matters or things affecting the Premises, any Personal Premises inclusive of, without limitation, fixtures or appliances, utilities, equipment or furnishings at the Premises and included in this sale, if any, (ii) as to the physical condition of, suitability for development, zoning, or use to which the Premises may be put, (iii) environmental condition (including without limitation the presence of any hazardous or toxic materials), (iv) except as may be expressly provided otherwise in this Contract, the leases, rents, income or expenses of the Premises, (v) the compliance of the Premises or the Leases and/or the Tenancies or use of the Premises or any portion thereof with the any law, rule, regulation, code or governmental order of any governmental authority, or any other matter regarding the status of the Leases or the rental being paid by the tenants thereunder, including, without limitation, whether or not same is subject to rent control, rent stabilization or other governmental rental regulation or legality of rent charges, (vi) with respect to any filings including, without limitation, under rent control, rent stabilization or other rent regulation, made or required to be made on account of any current or prior lease, tenancy  or occupancy at the Premises; and (vii) any litigation, actions, investigations, proceedings, or orders, including any of foregoing at, before or by any governmental authority or agency, relating to or arising out of the Leases at the Premises, or otherwise affecting or relating to the Premises; or the status or outcome of any of the foregoing.

(Dkt. No. 1-1, Contract, Section 5.01(b)). Section 5.01(b) excludes representations, warranties, and guaranties "[e]xcept as expressly provided in this Contract . . ." (*Id.*) The exception would include all the representations of Section 4 (and Section 4.02(k) and (b) specifically), which were to be restated as of closing. The Court's order essentially reads those warranties and representations out of the Contract in direct contravention of the exception contained in Section 5.01(b)(v) and the authorities cited above.

Section 4 and Section 5.01 can and should be read in harmony to give meaning to both provisions of the Contract, instead of reading Section 5.01 as nullifying or to use the Court's language "superseding" Section 4. When read together, Seller made express contractual representations and warranties in Section 4 that no tenants were in breach of their leases, which representations and warranties "are and shall be restated as of the Closing Date," and Section 5 is an acknowledgment by Purchaser that other than the representations and warranties expressly made in Section 4, Seller has not made any additional representations and warranties. Section 5.01(a) confirms this construction of the Contract, and states "in entering into this Contract, Purchaser has not been induced by and has not relied upon any representations, warranties, or statements, whether express or implied made by Seller . . . which are not expressly set forth in this Contract." (DE 1-1, pp. 7-8.)

While the Contract's terms can be read together with each provision given meaning, the Court improperly read the provisions as conflicting with each other and found that one "except as otherwise provided in this Contract" somehow superseded another "except as otherwise provided in this Contract." If the provisions are deemed to conflict with each other, then the Court must look to the parties contemporary interpretations of the Contract. "When the terms of a contract are in conflict, contemporary interpretations of the contract by the parties are determinative." *Richland-Lexington Airport Dist. v. Am. Airlines, Inc.*, 306 F. Supp. 2d 548, 565 (D.S.C. 2002), *aff'd*, 61 F. App'x 67 (4th Cir. 2003) (citing *Kitchens v. Lee*, 221 S.C. 59, 69 S.E.2d 67 (1952)). Here, the contemporaneous

communications from the Seller confirm the construction of the Contract urged by Buyer. When Seller learned of Tenant Arcade's breaches of its underlying Lease, Seller acknowledged, "my client can no longer restate the representations of Section 4.02 as it pertains to the Arcade as they have failed to pay June, 2022 Rent or Additional Rent and now appear to be abandoning/surrendering the premises." (DE 18-13 and 7-1). In recognition of that inability to restate, Seller sought to amend the Contract's representations and warranties by affirming the following:

> Seller hereby affirms that such Seller's representations and warranties as set forth in the Contract of Sale and Agreement remain true and correct in all material respects on the date hereof **except that Epic Arcades SC LLC has not paid Rent or Additional Rent for June, 2022 and, upon information and belief, is surrendering and abandoning the Premises as of June 14, 2022.**

(DE 21-1) (emphasis added). Seller's own acknowledgments demonstrate that Seller believed there was an obligation to restate, that there had been a breach of the Tenant Arcade's Lease, and that Seller would not be able to restate as of the closing date.

For all of these reasons, the Court committed an error of law in its construction of the Contract. The clear intent of the Contract was that Buyer was to receive what it contracted for at closing. Under Seller's construction and the Court's Order, the representations and warranties as of closing are written out of the Contract such that Buyer would be forced to purchase a much less valuable asset (a shopping center minus an anchor tenant) at full price or forfeit its down payment. The Court should revisit its order to correct these errors.

<u>**CONCLUSION**</u>

Based on the foregoing, Buyer respectfully requests that the Court alter and amend its Order (DE 31) to grant Jersam summary judgment on its Counterclaims, award the relief sought therein, and deny Plaintiff's Motion for Summary Judgment (DE 16) and subsequent motions relating to interest and attorney's fees (DE 35, 36).

Respectfully Submitted,

**HAYNSWORTH SINKLER BOYD, P.A.**

*s/Stafford J. McQuillin III*
Stafford J. McQuillin III (Fed ID #10715)
mmcquillin@hsblawfirm.com

**AND**

**PARKER NELSON & ASSOCIATES**

Theodore Parker III (Fed ID #12224)
Tparker@pnalaw.net

*Attorneys for Jersam Realty, Inc.*

October 24, 2022